UNITED STATES v. COLORADO & N. W. R. CO.

(Circuit Court of Appeals, Eighth Circuit.   November 25, 1907.)

No. 2,568.

1. RAILROADS—SAFETY APPLIANCE ACTS—RAILROADS OPERATED WITHIN SINGLE STATES RESPECTIVELY.

The safety appliance acts (Acts March 2, 1893, c. 196, 27 Stat. 531, amended by Act April 1, 1896, c. 87, 29 Stat. 85 [U. S. Comp. St. 1901, p. 3174], and Act March 2, 1903, c. 976, 32 Stat. 943 [U. S. Comp. St. Supp. 1907, p. 885]), apply to and govern a railroad company engaged in interstate commerce which operates entirely within a single state, independently of all other carriers.

The transportation of articles of interstate commerce is the test of the application of these acts.

2. COMMERCE—INTERSTATE COMMERCE—EVERY PARTICIPATOR IN TRANSPORTATION OF COMMERCIAL ARTICLES FROM STATE TO STATE IS ENGAGED IN.

The importation into one state from another is the test of interstate commerce.

Every part of every transportation of articles of commerce in a continuous passage from a commencement in one state to a prescribed destination in another is a transaction of interstate commerce.

Every carrier who transports such goods through any part of such continuous passage is engaged in interstate commerce, whether the goods are carried upon through bills of lading or are rebilled by the several carriers.

3. SAME—REGULATION—CONGRESS MAY AFFECT INTRASTATE COMMERCE SO FAR AS NECESSARY TO REGULATE EFFECTUALLY INTERSTATE COMMERCE.

Congress may lawfully affect intrastate commerce so far as necessary to regulate effectually and completely interstate commerce, because the Constitution reserved to Congress plenary power to regulate interstate and foreign commerce, and the Constitution and the acts of Congress in pursuance thereof are the supreme law of the land.

4. RAILROADS—CONSTRUCTION OF SAFETY APPLIANCE ACTS NOT GOVERNED BY INTERPRETATION OF INTERSTATE COMMERCE ACT.

The construction of the language of the safety appliance acts (Act March 2, 1893, c. 196, § 1, 27 Stat. 531, amended by Act April 1, 1896, c. 87, 29 Stat. 85 [U. S. Comp. St. 1901, p. 3174], and Act March 2, 1903, c. 976, 32 Stat. 103 [U. S. Comp. St. Supp. 1907, p. 885]) is not controlled by the language or by the interpretation of the terms of the interstate commerce act (Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154]).

5. STATUTES—WHERE PLAIN, INTERPRETATION HAS NO FUNCTION.

Construction and interpretation have no function where the terms of the statute are plain and certain and its meaning is clear.   In such a case Congress must be presumed to mean what it has plainly expressed.

6. SAME—COMMON MEANING OF LANGUAGE PREFERRED TO RECONDITE SIGNIFICATION.

The natural, common, or obvious meaning of the language of a law must be preferred, save in rare and exceptional cases, to a recondite signification evolved only by patient study and diligent search for it.

7. SAME—RULE IN PARI MATERIA INAPPLICABLE TO INTERSTATE COMMERCE ACT AND SAFETY APPLIANCE ACTS.

The rule in pari materia, the rule that the language of statutes upon the same or similar subjects should have like interpretation, is inapplicable where the provisions of the later statute are positive and explicit, and also where the subjects of the statutes, the mischiefs at which they are leveled, and the remedies so provided are radically different.

It does not subject the construction of the safety appliance acts (Acts

March 2, 1893, c. 196, 27 Stat. 531, amended by Act April 1, 1896, c. 87, 29 Stat. 85 [U. S. Comp. St. 1901, p. 3174], and Act March 2, 1903, c. 976, 32 Stat. 103 [U. S. Comp. St. Supp. 1907, p. 885]), to the language or the interpretation of the Interstate Commerce Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154].

8. SAME—PRESUMPTION THAT NO EXCEPTION WAS INTENDED WHERE CONGRESS HAS MADE NONE.

Where Congress makes no exception from a plain and certain declaration in an act, there is ordinarily a presumption that it intended to make none.

A secret intention of the lawmaking body may not be lawfully assumed by the courts and interpreted into a statute whose language is plain and unambiguous, and does not express or necessarily imply it.

Courts can give effect legally to the intentions of the lawmaking body expressed in a statute, or necessarily implied, and to those only.

Philips, District Judge, dissenting.

(Syllabus by the Court.)

In Error to the District Court of the United States for the District of Colorado.

The Colorado & Northwestern Railroad Company, a corporation of Colorado, owned and operated a narrow gauge railroad, which consisted of a main line about 10 miles long from Boulder to Sunset, and two branches, each about 18 miles in length to Eldora and Ward, respectively. This entire railroad was within the state of Colorado. The Northwestern Company was a common carrier, and in February, 1906, it transported in one of its freight cars from Boulder, where it had received it from the Union Pacific Railroad Company, to Sugar Loaf, a station upon its line, a shipment of hardware which had been sent to Omaha, Neb., consigned to O. P. Miller Company at Sugar Loaf, and, in another of its cars, it transported from Boulder, where it had received it from the Colorado & Southern Railroad Company, to Ward, a station on its railroad, a shipment of tablets which had been sent from Kansas City, Mo., consigned to Rundell & Miker at Ward. In the same cars it carried three other shipments of goods from points without the state to destinations on its line. These shipments were not carried upon through bills of lading, but they were consigned and carried upon continuous passages from their points of origin in eastern states to their destinations at the stations of the Northwestern Company in Colorado. The shipment to Sugar Loaf was rebilled from Boulder to that place by the Northwestern Company, and the shipment to Ward was rebilled by the Colorado & Southern Railroad Company at Denver, from that place to Ward, and at Boulder the Northwestern Company advanced the freight charges for the previous transportation upon both shipments, and it collected the entire freight charges from Kansas City and Omaha to the destinations of the goods of the consignees of the respective shipments. The railroad of the Colorado & Southern Company had a narrow gauge, and its tracks connected with those of the Northwestern Company at Boulder. The railroad of the Union Pacific Company had a standard gauge, and its track at Boulder ran along one side and the track of the Northwestern Company along the other side of a platform across which freight was transferred from the cars of each to those of the other. There was no evidence of any common control, arrangement, or management of the Northwestern Company and any other carrier for a continuous passage or shipment of these or other articles of interstate commerce. The engines and cars of the Northwestern Company were not equipped with automatic couplers. Links and pins were used upon them. There was evidence tending to show that it was the practice of that company to receive and carry to their destinations shipments originating outside of the state like those before specified. The United States brought an action against that company to recover the penalties fixed by the safety appliance acts for carrying the two shipments first described in cars not equipped with automatic couplers, and upon the foregoing facts the court below instructed the jury to return a verdict for the defendant. This ruling is challenged by the writ of error.

Luther M. Walter and Ralph Hartzell (Earl M. Cranston, on the brief), for plaintiff in error.

P. H. Holme (Dines, Whitted & Dines, on the brief), for defendant in error.

Before SANBORN and VAN DEVANTER, Circuit Judges, and PHILIPS, District Judge.

SANBORN, Circuit Judge (after stating the facts as above). This case presents a single question. Is a common carrier which operates a railroad entirely within a single state, and transports thereon articles of commerce shipped in continuous passages from places without the state to stations on its road, or from stations on its road to points without the state, free from any common control, management, or arrangement with another carrier for a continuous carriage or shipment thereof, subject to the provisions of the safety appliance acts?

These acts declare that: "It shall be unlawful for any common carrier engaged in interstate commerce by railroad" (section 1) "to haul, or permit to be hauled or used on its line any car (except four-wheeled cars and certain logging cars, section 6) used in moving interstate traffic not equipped with couplers coupling automatically by impact" (section 2), and that any such common carrier hauling, or permitting to be hauled or used on its line, any such unequipped car shall be liable to a penalty of $100 for each violation of the act. Act March 2, 1893, c. 196, 27 Stat. 531, as amended by Act April 1, 1896, c. 87, 29 Stat. 85 [U. S. Comp. St. 1901, p. 3174]; Act March 2, 1903, c. 976, 32 Stat. 943 [U. S. Comp. St. Supp. 1907, p. 885].

Importation into one state from another is the indispensable element, the test, of interstate commerce. Every part of every transportation of articles of commerce in a continuous passage from an inception in one state to a prescribed destination in another is a transaction of interstate commerce. Goods so carried never cease to be articles of interstate commerce from the time they are started upon their passage in one state until their delivery at their destination in the other is completed, and they there mingle with and become a part of the great mass of property within the latter state. Their transportation never ceases to be a transaction of interstate commerce from its inception in one state until the delivery of the goods at their prescribed destinations in the other, and every one who participates in it, who carries the goods through any part of their continuous passage, unavoidably engages in interstate commerce. Rhodes v. Iowa, 170 U. S. 412, 418, 419, 426, 18 Sup. Ct. 664, 42 L. Ed. 1088; Kelley v. Rhoads, 188 U. S. 1, 23 Sup. Ct. 259, 47 L. Ed. 359; Houston Direct Nav. Co. v. Ins. Co. of North America, 89 Tex. 1, 32 S. W. 889, 891, 30 L. R. A. 713, 59 Am. St. Rep. 17; Leisy v. Hardin, 135 U. S. 100, 10 Sup. Ct. 681, 34 L. Ed. 128; Lyng v. Michigan, 135 U. S. 161, 10 Sup. Ct. 725, 34 L. Ed. 150; Caldwell v. North Carolina, 187 U. S. 622, 631, 632, 23 Sup. Ct. 229, 47 L. Ed. 336.

There is nothing in conflict with this proposition in Gulf, Colorado & Sante Fé Ry. Co. v. Texas, 204 U. S. 403, 27 Sup. Ct. 360, 51 L. Ed. 540, because in that case the prescribed destination of the inter-

state shipment, whose origin was in South Dakota, was Texarkana, Tex. The assignee of the owner of the property who had shipped it to Texarkana rebilled the shipment from Texarkana, Tex., to Goldthwaite, in that state, and the Supreme Court held that the contract and carriage from Texarkana to Goldthwaite were intrastate and not interstate commerce. In the case at bar the consignors shipped the goods to their prescribed destinations in Colorado when they started them from Kansas City and Omaha, respectively, and they never rebilled nor changed the destinations. The goods went in continuous passages from the origins of their transportation in eastern states to their final destinations upon the line of the Northwestern Company in Colorado. The rebilling practiced by the railroad companies without any new consents or contracts with the owners could not destroy or affect the interstate character of the shipments or of the transportation. The Northwestern Company was a common carrier; it transported from Boulder, Colo., to their prescribed destinations in that state, articles of interstate commerce consigned from cities in Missouri and Nebraska, respectively, upon continuous passages, to their designated destinations in Colorado. Each of these transportations from the respective points in Missouri and Nebraska to the places of consignment of the goods in Colorado was a single interstate carriage and transaction, and the Northwestern Company, by reason of its transportation of these and like shipments through a part of their interstate carriage, necessarily became a "common carrier engaged in interstate commerce by railroads," and thus fell within the literal terms and the ordinary meaning of the provision of the safety appliance acts, which declare that it shall be unlawful for "any common carrier engaged in interstate commerce by railroad to haul cars used in moving interstate traffic unequipped with automatic couplers." Counsel for the company contend that this statute should be construed to except companies independently participating in such transportation. But construction and interpretation have no place or function where the terms of the statute are clear and certain, and its meaning is plain. In Lake County v. Rollins, 130 U. S. 662, 670, 9 Sup. Ct. 651, 32 L. Ed. 1060, the Supreme Court, after discussing the application of this rule to contracts and Constitutions, said:

"So, also, where a law is expressed in plain and unambiguous terms, whether those terms are general or limited, the Legislature should be intended to mean what they have plainly expressed, and consequently no room is left for construction. U. S. v. Fisher, 2 Cranch, 358, 399, 2 L. Ed. 304; Doggett v. Railroad Company, 99 U. S. 72, 25 L. Ed. 301."

No words or terms in the English language occur to us which could express with more clearness and certainty, than those embodied in this statute, the requirement that every common carrier engaged in interstate commerce by railroad shall equip the cars it uses to move interstate traffic, and that are not expressly excepted by the sixth section of the act, with automatic couplers. And if the Congress "should be intended to mean what they have plainly expressed," they must have meant that no common carrier engaged in such commerce by railroad, whether its railroad was long or short, whether it was within one or many states, whether it was engaged much or little in that com-

merce, and whether it operated independently or under a common control, management, or arrangement with some other carrier, could lawfully move interstate traffic in its cars without first equipping them with automatic couplers, for so the Congress plainly enacted. This view of the effect of this legislation is not without authoritative support. The power to regulate commerce among the states is general, and includes authority to regulate all its parts, (1) the subjects of commerce, the articles, information, intelligence transported from state to state; (2) the transactors of commerce, the merchants, carriers, laborers who carry it on; (3) the means, the vehicles, the cars, steamboats, coaches, wagons by which subjects of commerce are carried; (4) the operation, the contracts, terms, rates under which it is conducted. While this power to regulate is general, the regulations themselves by means of which this power is exercised must necessarily be particular and appropriate to the respective parts of this commerce which they are enacted to govern. A regulation of the operation of a telegraph company or of an express company might not be an apposite or effective regulation of the operation of stage coaches. A regulation of the rates of transportation of carriers operating stage coaches, wagons, steamboats, street cars or cars moved by steam, might not constitute a suitable or appropriate regulation of the construction of those vehicles. Hence a decision which construes a regulation of the vehicles of commerce is the most apt, persuasive, and controlling in the interpretation of the acts under consideration, since they constitute regulations of carriages of this character.

By Act July 7, 1838, c. 191, 5 Stat. 304, and Act Aug. 30, 1852, c. 106, 10 Stat. 61, Congress provided for the inspection and licensing of vessels propelled by steam which were engaged in interstate commerce, and prohibited their operation without a license under a penalty of $500. The Daniel Ball, a steamboat, was navigating the Grand river in the state of Michigan without a license, and the United States brought a suit for the penalty. The owners of the vessel answered that the steamer was not engaged in trade or commerce between two or more states, but was employed solely in intrastate commerce. The parties to the suit stipulated that the vessel operated entirely within the state of Michigan between Grand Rapids, and Grand Haven, that she did not run in connection with, or in continuation of, any line of steamers or vessels on the lake, or any line of railway in the state, but that she was a common carrier between the two cities named, and "that some of the goods that she shipped to Grand Rapids and carried to Grand Haven were destined and marked for places in other states than Michigan, and that some of the goods which she shipped at Grand Haven came from other states and were destined for places within that state." The Daniel Ball, 10 Wall. 557, 559, 19 L. Ed. 999. Upon this state of facts the Supreme Court affirmed the judgment for the penalty. Upon the matters pertinent to the questions in this case it said:

"In this case it is admitted that the steamer was engaged in shipping and transporting down Grand river goods destined and marked for other states than Michigan, and in receiving and transporting up the river goods brought within the state from without its limits; but inasmuch as her agency in the

transportation was entirely within the limits of the state, and she did not run in connection with, or in continuation of, any line of vessels or railway leading to other states, it is contended that she was engaged entirely in domestic commerce. But this conclusion does not follow. So far as she was employed in transporting goods destined for other states, or goods brought from without the limits of Michigan and destined to places within that state, she was engaged in commerce between the states, and however limited that commerce may have been, she was, so far as it went, subject to the legislation of Congress. She was employed as an instrument of that commerce, for whenever a commodity has begun to move as an article of trade from one state to another, commerce in that commodity between the states has commenced. The fact that several different and independent agencies are employed in transporting the commodity, some acting entirely in one state, and some acting through two or more states, does in no respect affect the character of the transaction. To the extent in which each agency acts in that transportation, it is subject to the regulation of Congress. It is said that if the position here asserted be sustained, there is no such thing as the domestic trade of a state; that Congress may take the entire control of the commerce of the country, and extend its regulations to the railroads within a state on which grain or fruit is transported to a distant market. We answer that the present case relates to transportation on the navigable waters of the United States, and we are not called upon to express an opinion upon the power of Congress over interstate commerce when carried on by land transportation. And we answer, further, that we are unable to draw any clear and distinct line between the authority of Congress to regulate an agency employed in commerce between the states, when that agency extends through two or more states, and when it is confined in its action entirely within the limits of a single state. If its authority does not extend to an agency in such commerce, when that agency is confined within the limits of a state, its entire authority over interstate commerce may be defeated. Several agencies combining, each taking up the commodity transported at the boundary line at one end of a state, and leaving it at the boundary line at the other end, the federal jurisdiction would be entirely ousted, and the constitutional provision would become a dead letter."

The Daniel Ball, 10 Wall. 557, 565, 566, 19 L. Ed. 999; Foster et al. v. Davenport et al., 22 How. 244, 16 L. Ed. 248; Harmon v. City of Chicago, 140 Ill. 374, 29 N. E. 732; Houston Direct Nav. Co. v. Ins. Co. of North America, 89 Tex. 1, 32 S. W. 889, 891, 30 L. R. A. 713, 59 Am. St. Rep. 17; State v. Gulf, C. & S. F. Ry. Co. (Tex. Civ. App.) 44 S. W. 542, 543; Gulf, C. & S. F. Ry. Co. v. Fort Grain Co. (Tex. Civ. App.) 72 S. W. 419. The power to regulate interstate commerce is as complete upon the land as upon the navigable waters of the nation, and congressional regulation upon the former must be interpreted by the same rules and enforced with the same efficiency as like regulations upon the latter. In re Debs, 158 U. S. 564, 590, 591, 15 Sup. Ct. 900, 39 L. Ed. 1092. The plain and specific declaration of the acts of Congress before us, which has been recited, the familiar rule that where the terms of a statute are unambiguous and their meaning is plain there is no room for construction, and the apt and controlling opinion of the Supreme Court in the Daniel Ball Case, which decided, in a case strictly analogous, the material legal questions in this case, cogently persuade that the Northwestern Company was a common carrier engaged in interstate commerce by railroad within the true meaning of the safety appliance acts, and was thereby required to equip its cars with automatic couplers, and no doubt upon this subject would remain, were it not for the fact that judges whose ability, learning, and wisdom deserve and command the respect of all have reached

a different conclusion, and counsel for the company invoke their decision and urge us to follow it.

In United States v. Geddes, 65 C. C. A. 320, 323, 131 Fed. 452, 455, the Circuit Court of Appeals of the Sixth Circuit held that a railroad company which transported articles of interstate commerce consigned from one state to another over a railroad entirely within a single state which it owned, under circumstances similar to those in the case at bar, was not "a common carrier engaged in interstate commerce by railroad," within the meaning of the safety appliance acts, because the interstate commerce act (Act Feb. 4, 1887, c. 104, § 1, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154]) reads: "The provisions of this act shall apply to any common carrier or carriers engaged in the transportation of passengers or property wholly by railroad, or partly by railroad and partly by water, when both are used, under a common control, management or arrangement, for a continuous carriage or shipment from one state or territory of the United States, or the District of Columbia, to another state or territory of the United States, or the District of Columbia," and because the defendant company was not engaged in the transportation with another carrier "under a common control, management or arrangement for a continuous passage or shipment" from one state to another. It is probable that the clause "under a common control, management or arrangement for a continuous carriage or shipment" in this act qualified common carriers "partly by railroad and partly by water" only, and had no application to such carriers wholly by railroad, although there is high authority to the contrary (U. S. v. Geddes, 65 C. C. A. 320, 131 Fed. 452; Interstate Commerce Commission v. Bellaire, Z. & C. Ry. Co. [C. C.] 77 Fed. 942; Ex parte Koehler [C. C.] 30 Fed. 867; U. S. v. Chicago, K. & S. R. Co. [C. C.] 81 Fed. 783) and it is certain that it is thus limited in its effect since the amendatory act of June 29, 1906 (34 Stat. 584, c. 3591, § 1 [U. S. Comp. St. Supp. 1907, p. 892]). But the Geddes Case was decided, and the argument in this case has been presented and will be considered, upon the theory that this clause in the original act was a part of the specification of the carriers wholly by railroad who were subject to its provisions.

The argument of counsel for the company, in support of the construction adopted by the Court of Appeals of the Sixth Circuit, is (1) that the part of the first section of the "interstate commerce act" quoted above, constituted a new and exclusive definition of carriers engaged in interstate commerce; (2) that Mr. Justice Shiras in Texas & Pacific Ry. Co. v. Interstate Commerce Commission, 162 U. S. 197, at page 212, 16 Sup. Ct. 666, at page 672 (40 L. Ed. 940) in speaking of this act, said, "It would be difficult to use language more unmistakably signifying that Congress had in view the whole field of commerce (excepting that wholly within a state) as well that between the states and territories as that going to or coming from foreign countries"; (3) that if that statement was accurate, then to be a "common carrier engaged in interstate commerce by railroad" within the meaning of the safety appliance act of 1893, which was enacted six years later, a railroad must be "engaged in the transportation of passengers or property wholly by railroad or partly by railroad and partly by water when

both are used, under a common control, management or arrangement for a continuous carriage or shipment" from one state to another; (4) that Congress sought to regulate interstate commerce by each act, and that having defined interstate commerce in the first act, the words "any common carrier engaged in interstate commerce" in the subsequent safety appliance acts were restricted to those carriers specified in that definition, and included only such as were so engaged with others under a common control, management, or arrangement for a continuous passage or shipment; and (5) that any other construction would compel railroad companies operating in single states, to which articles of interstate commerce that they might not lawfully refuse to carry were tendered for transportation, to comply with the safety appliance acts, and would thereby draw all commerce under national regulation. A careful study of this argument in all its branches has brought to mind some reasons why it is not convincing, which will be briefly stated.

The major premise of the argument is that Congress by the act of 1887, made an authoritative definition of carriers engaged in interstate commerce by railroad and partly by railroad and partly by water, to which subsequent legislation and decision is subject; that after the passage of that act no carrier by railroad and no carrier partly by railroad and partly by water, who conducted within a single state a part of the continuous transportation of articles of interstate commerce, was engaged in that commerce, unless it conducted that carriage with some other carrier under a common control, management, or arrangement for a continuous carriage or shipment. Is this the true construction and effect of the first section of the interstate commerce act of 1887? When Congress passed that statute, conclusive decisions and universal assent had established the rule of law that common carriers engaged entirely within a single state in the transportation of articles of interstate commerce included two classes: (a) Those who conducted that transportation with another or other carriers under a common control, management, or arrangement for a continuous carriage, or shipment; and (b) those who conducted such transportation alone, or with other carriers without any common control, management, or arrangement for such a carriage or shipment. The question whether or not carriers of the second class were engaged in interstate commerce was settled. The Daniel Ball Case, 10 Wall. 557, 565, 19 L. Ed. 999, and the cases cited supra under that case. It was not acute, debatable or open, and the purpose of the act of 1887 was not to answer it. If it had been the intention of Congress and the meaning of that act that the established rule of law upon that question should be abrogated, that a new definition of carriers engaged in interstate commerce should be made which would imperatively exclude the second class from interstate commerce, it is reasonable to believe that the lawmaking body would have made this purpose to cause so radical a departure from the law of the land clear and indisputable by a direct declaration and enactment which could easily have been written in a few lines, that henceforth carriers engaged in interstate commerce by railroad should include those of the first class only, or that they should exclude those of the second class. But the act con-

tains no such declaration or provision. On the other hand, in the face of the established rule of law that carriers by railroad engaged in interstate commerce consisted of both classes, the Congress enacted that "the provisions of this act shall apply to" the members of the first class, and there it stopped and enacted nothing more pertinent to this issue.

The existence of the two well-known classes of carriers engaged in interstate commerce, the absence of any declaration or enactment that the rule which included the members of both classes among such carriers should be abrogated or in any way modified, and the simple declaration of the act that its provisions should apply to the members of the first class without more upon this subject, render it difficult to believe that the purpose or effect of the first section of this statute was any other than to select out of all the carriers engaged in interstate commerce by railroad or partly by railroad and partly by water, and to specify, as its clear and certain words purport to do, the class of those carriers to which its provisions apply. The remark of Mr. Justice Shiras in Texas & Pacific Ry. Co. v. Interstate Commerce Commission, 162 U. S. 212, 16 Sup. Ct. 672 (40 L. Ed. 940), with reference to the interstate commerce act, that "It would be difficult to use language more unmistakably signifying that Congress had in view the whole field of commerce, excepting commerce wholly within a state," is not persuasive upon the legal issue before us, (a) because this question was not presented, discussed, or decided in that case, wherein the court was considering only the relation of the circumstances, conditions, and rates of transportation of foreign commerce to the circumstances, conditions, and rates of transportation of interstate commerce under the act of 1887, and expressions in the opinions of courts are not authoritative beyond the questions which they were considering and deciding when they used them (Cohens v. Virginia, 6 Wheaton, 264, 299, 5 L. Ed. 257), (b) because the statement that Congress had in view the whole field of interstate commerce when it passed this act is far from an assertion, and could never have been intended to be a declaration that Congress had regulated, or had intended by that act to regulate, every carrier engaged in interstate commerce within its regulating power, for that was obviously not the fact. It did not regulate and evidently did not intend to regulate carriers engaged in the transportation of subjects of interstate commerce by stage coach, by wagon, entirely by water, or such carriers partly by water and partly by railroad, when they were not operating with other carriers under a common control, management, or arrangement, (c) because the statute expressly declared that the provisions of the act should apply to the members of a specific class of carriers engaged in interstate commerce, and omitted, and thereby excluded from subjection to its provisions, those of other classes. The amendatory act of June 29, 1906 (34 Stat. 584, c. 3591, § 1 [U. S. Comp. St. Supp. 1907, p. 892]), is a demonstration that the original act was not intended to and did not regulate all common carriers engaged in interstate commerce by railroad within the power of Congress, for the amendment applies the provisions of the act to common carriers engaged in interstate commerce wholly by railroad who are exempt from any common control, manage-

ment, or arrangement with other carriers, and applies its provisions to many other carriers not subject to the terms of the original act.

The rule in pari materia, which counsel for the company invoke, the rule that the similar terms of statutes enacted for like purposes should receive like interpretations, is inapplicable to the interstate commerce act and the safety appliance acts, because the provision of the latter relative to the question before us is plain and explicit, and a statute falls under that rule only when its terms are ambiguous or its significance is doubtful (Endlich on Interpretation of Statutes, § 53, p. 67), and because the evils to be remedied, the objects to be accomplished, and the enactments requisite to attain them are radically different. It is true that each act was a regulation of interstate commerce, but so are the Sherman anti-trust act, the employer's liability act, the various acts regulating the inspection of steamboats, and the navigation of the inland rivers, lakes and bays, and many other acts, too numerous to mention or review. It does not follow from the facts that the interstate commerce act was first passed, and that it regulates commerce among the states, and declares that its provisions shall apply to the members of a certain class of carriers engaged therein, that the Sherman anti-trust act, the safety appliance acts, and other subsequent acts regulating commerce apply to the members of that class only, in the face of the positive declarations of the later acts that they shall govern other parties and other branches of commerce. The subject of the first act was the contracts, the rates of transportation of articles of interstate commerce; the subject of the safety appliance acts was the construction of the vehicles, the cars, and engines which carry that commerce. The evils the former was passed to remedy were discrimination and favoritism in contracts and rates of carriage; the evils the latter was enacted to diminish were injuries to the employés of carriers by the use of dangerous cars and engines. The remedy for the mischiefs which induced the passage of the former act was equality of contracts and rates of transportation; the remedy for the evils at which the latter act was leveled was the equipment of cars and engines with automatic couplers. Neither in their subjects, in the mischiefs they were enacted to remove, in the remedies required, nor in the remedies provided, do these acts relate to similar matters, and the rule that the words or terms of acts in pari materia should have similar interpretations ought not to govern their construction. The contention that if a railroad company conducting the transportation of articles of interstate commerce entirely within a single state and independent of other carriers, is held to be subject to the safety appliance acts, it must receive articles of interstate commerce for transportation, and all carriage both interstate and intrastate will thus become subject to national regulation, neither terrifies nor convinces.

The Constitution reserved to the nation the unlimited power to regulate interstate and foreign commerce, and if that power cannot be effectually exercised without affecting intrastate commerce, then Congress may undoubtedly in that sense regulate intrastate commerce so far as necessary, in order to regulate interstate commerce fully and effectually. The people of the United States carved out of their

sovereign power, reserved from the states, and granted to the Congress of the United States exclusive and plenary power to regulate commerce among the states and with foreign nations. That power is not subordinate, but it is paramount to all the powers of the states. If its independent and lawful exercise of this congressional power and the attempted exercise by a state of any of its powers impinge or conflict, the former must prevail and the latter must give way. The Constitution and the acts of Congress passed in pursuance thereof are the supreme law of the land. "That which is not supreme must yield to that which is supreme." Brown v. Maryland, 12 Wheat. 419, 448, 6 L. Ed. 678; Gibbons v. Ogden, 9 Wheat. 1, 209, 210, 6 L. Ed. 23; Gulf, Colorado, etc., Ry. Co. v. Hefley, 158 U. S. 98, 15 Sup. Ct. 802, 39 L. Ed. 910; Int. Commerce Commission v. Detroit, etc., Ry. Co., 167 U. S. 633, 642, 17 Sup. Ct. 986, 42 L. Ed. 306; State Freight Tax Case, 15 Wall. 232, 275, 280, 21 L. Ed. 146; Pensacola Telegraph Co. v. Western Union Telegraph Co., 96 U. S. 1, 8, 24 L. Ed. 708; Chy Lung v. Freeman, 92 U. S. 275, 280, 23 L. Ed. 550; Ry. Co. v. Husen, 95 U. S. 465, 471, 472, 473, 24 L. Ed. 527; Hall v. De Cuir, 95 U. S. 485, 488–490, 497, 498–513, 24 L. Ed. 547; Cooper Mfg. Co. v. Ferguson, 113 U. S. 727, 736, 737, 5 Sup. Ct. 739, 28 L. Ed. 1137; Bowman v. Chicago, etc., Ry. Co., 125 U. S. 465, 479, 480, 481, 484, 485, 488, 489, 490, 491, 507, 508, 8 Sup. Ct. 689, 1062, 31 L. Ed. 700; Welton v. Missouri, 91 U. S. 275, 280, 23 L. Ed. 347; Lyng v. Michigan, 135 U. S. 161, 166, 10 Sup. Ct. 725, 34 L. Ed. 150; Norfolk, etc., Ry. Co. v. Pennsylvania, 136 U. S. 114, 115, 118, 120, 10 Sup. Ct. 958, 34 L. Ed. 394; Crutcher v. Kentucky, 141 U. S. 47, 57, 58, 59, 11 Sup. Ct. 851, 35 L. Ed. 649; Osborne v. Florida, 164 U. S. 650, 655, 17 Sup. Ct. 214, 41 L. Ed. 586; Caldwell v. North Carolina, 187 U. S. 622, 623, 23 Sup. Ct. 229, 47 L. Ed. 336. It was the evident and declared purpose of the safety appliance acts to require every common carrier engaged in interstate commerce, and hence every common carrier so engaged independently in a single state, to comply with the requirements of the statute. No greater burden is thereby imposed upon a company engaged in such commerce within one state than upon one so engaged in more than one state. There was as urgent a demand, and as much reason and necessity, for the protection of the lives and limbs of the servants of railroad companies operating in a single state as of preserving the lives and limbs of the servants of such companies operating across state lines. The safety appliance acts might be practically evaded and thus rendered futile if companies independently transporting articles of interstate commerce in single states could exempt themselves from their provisions by conducting all such transportation, except that across the imaginary lines which divide the states, by means of corporations operating in single states only, and finally the objection here under consideration was determined to be untenable by the controlling opinion of the Supreme Court in the Daniel Ball Case, where it was equally available, was considered and overruled (10 Wall. 565, 19 L. Ed. 999), for Congress has the same "fullness of control" over interstate commerce carried upon railroads and other artificial highways upon the land that it has over that borne upon the navigable

waters of the nation. In re Debs, 158 U. S. 590, 591, 15 Sup. Ct. 900, 39 L. Ed. 1092.

Some of the reasons why the argument of counsel in support of the construction of these acts which they seek, has not proved convincing, have now been stated. There are, however, other and controlling considerations which deter us from the conclusion they urge. Congress enacted that "it shall be unlawful for any common carrier engaged in interstate commerce by railroad" to haul any car on its line, used in moving interstate traffic, unequipped with automatic couplers, except four-wheeled cars and certain logging cars and the engines which draw them. The construction of this enactment sought, in effect amends this positive declaration by importing into it the exception which appears in italics below, so that it would read, "it shall be unlawful for any common carrier engaged in interstate commerce by railroad, * * * *except a common carrier engaged in interstate commerce by railroad wholly within a single state and not under a common control, management or arrangement with any other carrier for a continuous carriage or shipment"* to haul any car on its line used in moving interstate traffic unequipped with automatic couplers, except four-wheeled cars and certain logging cars and the engines used to haul them. But where the Congress makes no exception from the clear and certain declaration of a statute, there is ordinarily a presumption that it intended to make none. McIver v. Ragan, 2 Wheat. 25, 29, 4 L. Ed. 175; Bank v. Dalton, 9 How. 522, 528, 13 L. Ed. 242; Vance v. Vance, 108 U. S. 514, 521, 2 Sup. Ct. 854, 27 L. Ed. 808; Railway Co. v. B'Shears, 59 Ark. 237, 244, 27 S. W. 2. By so much the more is it true that where the lawmaking body has made exceptions to the general terms of an act, as in this instance, the presumption is that it intended to make no more. Again, if Congress intended to make this exception, it was a secret intention which the safety appliance acts not only failed to express, but which their terms expressly negatived. It is the intention expressed, or necessarily implied, in the law, and that alone, to which courts may lawfully give effect. They may not assume or presume purposes and intentions that are neither expressed nor implied, and then construe into the law the provisions to accomplish these assumed intentions. A secret intention of the lawmaking body cannot be legally interpreted into a statute which is plain and unambiguous, and which does not express or imply it. U. S. v. Wiltberger, 5 Wheat. 76, 5 L. Ed. 37; Bennett v. Worthington, 24 Ark. 487, 494; Tynan v. Walker, 35 Cal. 634, 95 Am. Dec. 152; Smith v. State, 66 Md. 215, 7 Atl. 49; Railway Co. v. Bagley, 60 Kan. 424, 56 Pac. 759.

The principal reasons which have been persuasive in the determination of the question in hand have now been stated. They have been presented at considerable length in deference to the opinion of the Court of Appeals of the Sixth Circuit in the Geddes Case, which it would have been a pleasure to follow, if the proper result had been doubtful in our opinion. But this case has been presented to this court for decision. The exercise of its independent judgment has been invoked, and it may not be lawfully denied. The positive and explicit declaration of the first section of the safety appliance act of 1893

that "it shall be unlawful for any common carrier engaged in interstate commerce by railroad" to use any cars unequipped with automatic couplers except four-wheeled cars and logging cars in moving interstate traffic, the clearness and certainty of this language which prohibits interpretation, the absence of any expression of the exception which the court is asked to import into this statute, the presumption from the plain language of the law that the Congress intended to make no such exception, the rule that the courts may not insert in a statute an enactment of an assumed secret intention of the lawmaking body which is not expressed therein or necessarily implied, the fact that the interstate commerce act does not appear to us to define common carriers engaged in interstate commerce by railroad, but simply to apply the provisions of that act to the members of a specified class of these carriers, the fact that the interstate commerce act is not in pari materia with the safety appliance acts, either in its subject-matter, in the evils it assails, or in the remedies it provides, so that neither its language nor the construction thereof is apposite to or controlling of the terms or of the interpretation of the latter act, the reason of the case which as imperatively requires the protection from dangerous vehicles of the employés of companies independently engaged in interstate commerce by railroad entirely within single states, as it does the protection of the servants of other companies employed in the transportation of articles of interstate commerce by railroad, all these and other facts, rules, and reasons to which reference has been made, have converged upon our minds with compelling power, and forced them to the conclusion that Congress did not intend to, and did not, except from the provisions of the safety appliance acts common carriers engaged in the transportation of articles of interstate commerce entirely within single states respectively, and exempt from any common control, management, or arrangement with other carriers for a continuous carriage or shipment, but that it intended to, and did, expressly include them therein and subject them thereto.

The question at the head of this opinion must therefore be answered in the affirmative, the judgment below must be reversed, and the case must be remanded to the District Court for a new trial, and it is so ordered.

PHILIPS, District Judge (dissenting). The majority opinion, while strong and persuasive, fails to command my assent. Its advanced doctrine respecting the extension of federal jurisdiction under the interstate commerce clause of the Constitution conflicts with some deeply rooted notions entertained by me respecting federal limitations of power.

The defendant in error is a railroad corporation chartered by the state of Colorado. It is a narrow gauge road, 3½ feet in width, with only 10 miles of main line, and two branches 18 and 20 miles in length, respectively. It runs exclusively within the county of Boulder. For some reason, not quite apparent, one of plaintiff's witnesses was permitted to testify that connection could be made with this narrow gauge road at Boulder by other narrow gauge line extending through the state of Colorado into New Mexico, at Santa Fé. The actual geography and

general railroad guides show that to accomplish this the carriage would have to be made from Boulder to Denver, over an inside narrow gauge road on the Colorado Southern, a distance of 29 miles; then from Denver to Leadville, over the highest mountain range traversed by any narrow gauge road in Colorado, on a line owned by the Colorado Southern, to Leadville, nearly due west, a distance of 157 miles; then from Leadville to Salida, over the D. & R. G. Railroad in an easterly direction, 60 miles; then from Salida to Alamosa, on the same road, directly south, 85 miles; then from Alamosa to Antonito, south, 28 miles, to the line between Colorado and the Territory of New Mexico, on this D. & R. G. Railroad, which is extended from there to Santa Fé, 125 miles. To say nothing of this zigzag course of the different narrow gauge roads, a shipment over them to New Mexico would cover a distance of between three and four hundred miles, whereas a shipment by direct line, by broad gauge, would not exceed 280 miles, avoiding the mountain climbing. In the absence, however, of any evidence of any such interstate shipment having ever been made, the importance or the relevancy of this testimony is not apparent.

The right of the state to grant charters whose functions are to be exercised solely within the territorial limits of its sovereignty is unquestionable. So long as it exercises only the powers granted, and performs only the functions incident to its creation, it is not subject to the supervision or interference of the federal government. While the power to regulate commerce with foreign nations and among the several states is conferred on Congress, the exclusive jurisdiction of the state over intrastate commerce is reserved to the state. How a railroad chartered by and exclusively operated within the state shall be equipped, and what shall be its duties respecting the carriage of freights and towards its employés, are within the exclusive jurisdiction and discretion of the state. Under the law of the jurisdiction of its creation the defendant railroad company is a common carrier of passengers and freights. As such it must accept and carry over its line all proper subjects of traffic, by whomsoever tendered, no matter from where it comes, whether from within or without the state. It is not permitted to inquire whether it comes from a given place in the state of Colorado or from a point outside of the state, or how it came to it. When offered to it for transportation, no matter by whom tendered, it has no discretion to refuse to carry it. By the law of the state creating it, and endowing it with its faculties as a common carrier, it has the right to say: This company will receive and bill the article for carriage over its independent line, limiting its responsibility by the local law and charging the rates for the carriage authorized by the law of Colorado, and not otherwise.

In respect of the shipments in question, the evidence, in brief, shows that the consignment from Omaha passed over the Union Pacific Railroad, a broad gauge line, to Boulder, where the goods were transferred for carriage to the defendant railroad company, but not on any through billing or under any joint arrangement for a continuous carriage. The bill of lading issued for the carriage from Boulder to destination on the defendant road was issued by the defendant. The charges for the carriage over the Union Pacific to Boulder were so much;

and the carriage from Boulder over the defendant company was for a separate and distinct amount. The other shipment was a consignment from Kansas City., Mo., to Denver by the Atchison, Topeka & Santa Fé Railway, where it was rebilled by the Colorado & Southern road from Denver to Salida, the Colorado & Southern connecting with the defendant road at Boulder. The billing showed that the charges from Kansas City to Denver were $2.45, and from Denver to Ward $1.23. So the shipment was under separate billing contracts, for separate and distinct charges, and the shipment from Denver to Ward was essentially an intrastate shipment. The Colorado & Southern "paid the Santa Fé all that was due them on the shipment up to Denver." The witness introduced by the plaintiff said the shipment was billed from Denver to Salida, and "was simply handled as a shipment passing through Boulder." In .answer to the question when the cars were brought in by the Union Pacific carrying shipments from points without the state, the witness said they were not handled by the crew or engine of the defendant company, and the crew of the defendant company did not handle the engines and cars from points without the state of Colorado. But, says the majority opinion:

"The rebilling practiced by the railroad company without any new consent or contract with the owners could not destroy or affect the interstate character of the shipment or of the transportation."

I cannot accede to the proposition that the consignor of the goods, by delivering a package at Kansas City, Mo., to a railroad company there, addressed to a point on the defendant's local road, without consultation with or the consent of the local road, can thereby impart to the article such character of interstate commerce as to compel the local road to carry it as such, subject to all the incidents of being engaged in interstate commerce. The receiving carrier at Kansas City, without the consent and co-operation of the local carrier, could make no arrangement for the through carriage with the consignor as would bind or affect the independent local road. The carrier at the initial point can make. any arrangement it sees fit for carrying the package over its line and any connecting line, extending into the state of Colorado; but when the carriage reaches the terminus of the through line, and the package is brought to the local line for further transportation, it must take and carry it over its line, not by virtue of any interstate law or regulation, but by reason of the obligatory force of the law of Colorado. It has the right to say: This company will receive it when tendered, but it will issue its own bill of lading, fixing then and there for the first time the terms of the contractual relation between the shipper and it, and make its own charges under the local law of the state of Colorado. Unless these conditions are assented to it may decline the shipment; and when it does take it on its own bill of lading, to be paid for according to its schedule rates, the consent of the shipper to its terms is implied without more. This new billing agreement for the first time establishes the relation of consignor and carrier between the shipper and the local railroad company. And I deny the power of Congress to step in and say to this creature of the state, thus acting within the terms of its charter: You shall not carry this article unless

you dismantle your car of the equipments permitted by the state and equip it in such fashion as Congress directs, and if you do not comply you will be penalized to the extent of the discretion of Congress. Such road doing a local business with no joint traffic arrangement with other carriers, issuing its own bill of lading, and charging for the carriage independent of any other carrier over whose lines the goods may have traveled, would not be subject to the provisions of the interstate commerce act, nor subject to the direction or supervision of the Interstate Commerce Commission. It would not be required to file its schedules of rates with the Interstate Commerce Commission, for the palpable reason that it is not engaged in interstate commerce traffic within the meaning of the act of Congress.

The Daniel Ball Case, 10 Wall. 557, 19 L. Ed. 999, relied upon in the majority opinion, involved the single question of the authority of the general government to license a vessel engaged in transportation on its navigable waters. By the act of Congress of July 7, 1838 (5 Stat. 304, c. 191), it was made unlawful for the owner, master, etc., of any vessel propelled in whole or in part by steam to transport any merchandise or passengers upon the bays, lakes, rivers, or other navigable waters of the United States without having first obtained from the proper officer a license under existing laws. And the amendatory act of August 30, 1852 (10 Stat. 61, c. 106), provided for the inspection of vessels so engaged. In answer to the libel presented against it for running without a license, the company disclosed that the steamer was employed in the navigation of Grand river between the cities of Grand Rapids and Grand Haven, within the state of Michigan, for the transportation of merchandise and passengers between those places, and that some of the goods shipped at Grand Rapids and carried to Grand Haven were destined and marked to places in other states than Michigan, and that some of the goods received came from other states and were destined to places without the state. It was held by the Supreme Court that it was subject to the license regulation.

It must be kept in mind, in applying the language of Mr. Justice Field in the discussion quoted in the majority opinion, (1) that the question pertained to the jurisdictional power of the United States over its navigable waters, and the act of Congress in question was bottomed upon that basis of governmental control; (2) that the vessel in question was not a railroad or conveyance chartered by the state, deriving its powers and functions from the state as an instrument of intrastate transportation; and (3) that there was no rebilling of the goods by the vessel evidencing and limiting its duties, and undertaking solely for the carriage over its own local line from one point to another within the state, making its own independent charges for the separate services rendered by it. So when the learned justice was confronted with the argument here made respecting the attitude of a local state railroad, he said:

"It is said that if the position here asserted be sustained, there is no such thing as the domestic trade of a state; that Congress may take entire control of the commerce of the country, and extend its regulations to the railroads within a state on which grain or fruit is transported to a distant market. We answer that the present case relates to transportation on the

navigable waters of the United States, and we are not called upon to express an opinion upon the power of Congress over interstate commerce when carried on by land transportation. And we answer further that we are unable to draw any clear and distinct line between the authority of Congress to regulate an agency employed in commerce between the states, when that agency extends through two or more states, and when it is confined in its action entirely within the limits of a single state."

When he thus spoke to the rule as applied to the power of Congress "to regulate an agency employed in commerce between the states," it will be observed that he referred to the instance "when that agency extends through two or more states," and not the instance where it is confined in its action entirely within the limits of a single state; from which it is clearly inferable that the jurisdiction of the United States is invoked only when the two agencies act in combination. This distinction is aptly illustrated by the case of Gulf, C. & S. F. Railway Company v. Texas, 204 U. S. 403, 27 Sup. Ct. 360, 51 L. Ed. 540. In that case the state of Texas recovered in the local court a judgment against said railway company for $100 for extortion in a charge for the transportation of a car load of corn from Texarkana, Tex., to Goldthwaite, Tex. In December, 1901, the Samuel Hardin Grain Company, of Kansas City, Mo., offered to sell Saylor & Burnett, at Goldthwaite, Tex., the corn in question, for delivery on the railway track at Goldthwaite. The corn to fill this contract was shipped from Hudson, S. D., and started to its destination. This was intercepted at Kansas City, Mo., by some conventional arrangement between the parties, and from Kansas City it was shipped over the Kansas City Southern Railway to Texarkana, Tex., on a bill of lading under shipper's orders to notify the commission company at Texarkana, Tex. The minimum interstate rate from Hudson, S. D., to Goldthwaite, Tex., was 46 cents per hundred, apportionable as follows: 18 cents from Hudson to Kansas City, and 28 cents from Kansas to Goldthwaite, Tex. The defendant railway company and the Kansas City Southern, with other connecting lines from Kansas City to Goldthwaite had established a joint tariff of 35 cents per hundred pounds. From Texarkana to Goldthwaite, Tex., the corn was reshipped to Goldthwaite over the Texas & Pacific Railway and the defendant company gave a bill reciting its receipt from the Hardin Grain Company, consigned to shipper's order, "notify Saylor & Burnett, Goldthwaite, Tex." It thus was forwarded after lying over five days in Texarkana. The only thing done by the agent of the shipper at Texarkana was to surrender the Kansas City Southern bill of lading and have the cars set over to the Texas & Pacific Railway, and taking a bill of lading from the latter. The defendant company was not a party to the bill of lading executed at Texarkana. The insistence of the railway company was that the shipment over the line in Texas was an interstate shipment, and therefore not subject to the local law of the state. The Supreme Court overruled this contention. Mr. Justice Brewer, who wrote the opinion in that case, distinctly held that the character of the shipment, whether local or interstate, depends on the contract of shipment, the rights and obligations of the carrier and shipper are reciprocal; that while the contract of shipment was from Hudson, S. D., to Texarkana, Tex., the

157 F.—22

·contract made at Kansas City for the sale of the corn did not affect the character of the shipment from Hudson to Texarkana, as an inter-state shipment; it still remained an interstate shipment. He then said:

"The control over the goods in process of transportation, which may be repeatedly changed by sales, is one thing; the transportation is another thing, and follows the contract of shipment, until this is changed by the agreement of owner and carrier. * * * When the Hardin Company accepted the corn at Texarkana the transportation contracted for ended. The carrier was under no obligations to carry it further. * * * Whatever obligations may rest upon the carrier at the terminus of its transportation to deliver to some further carrier, in obedience to the instructions of the owner, it is acting not as a carrier, but simply as a forwarder. No new arrangement having been made for transportation, the corn was delivered to the Hardin Company at Texarkana. Whatever may have been the thought or purpose of the Hardin Company in respect to the further disposition of the corn, was a matter immaterial so far as the completed transportation was concerned."

He then likened the case to the purchase of a ticket for interstate carriage from an outside place to Texarkana, to go on to Goldthwaite. On his arrival at Texarkana he would not be entitled to a new ticket from Texarkana to Goldthwaite at the proportionate fraction of the rate prescribed by the Interstate Commerce Commission for carriage from the outside place to Goldthwaite. "The one contract of the railroad company having been finished he must make a new contract for his carriage to Goldthwaite, and that would be subject to the law of the state within which that carriage was to be made." Significantly enough the learned justice concluded by saying:

"It must be further remembered that no bill of lading was issued from Texarkana to Goldthwaite until after the arrival of the corn at Texarkana, the completion of the first contract for transportation, the acceptance and payment by the Hardin Company. In many cases it would work the grossest injustice to a carrier if it could not rely on the contract of shipment it has made, know whether it was bound to obey the state or federal law, or, obeying the former, find itself mulcted in penalties for not obeying the law of the other jurisdiction, simply because the shipper intended a transportation beyond that specified in the contract. It must be remembered that there is no presumption that a transportation when commenced is to be continued beyond the state limits, and the carrier ought to be able to depend upon the contract which it has made, and must conform to the liability imposed by that contract."

This, it seems to me, contradicts the postulate in the majority opinion that the rebilling practiced by the railroad company, without any new contract with the owners, would not destroy or affect the interstate character of the shipment and of the transportation. On the contrary, the position asserted by Mr. Justice Brewer is that the shipper at Kansas City and the receiving carrier could make no contract for a continuous shipment therefrom which would entitle them, without the concurrence and participation therein of the local railroad company, to operate beyond the terminus of the through lines from Kansas City to Boulder, Colo. The distinct language is that notwithstanding the shipment of the corn in that case began in South Dakota, destined in its inception to Goldthwaite, in the state of Texas, yet when there was no through bill of lading to Goldthwaite, and to reach which the corn had to be reshipped and rebilled over the local road in the state, the local road being no party to any through continuous carriage contract, its character as an interstate shipment

did not obtain. He distinctly asserted that the transportation "follows the contract of shipment until that is changed by the agreement of owner and carrier." And I deduce from that pronouncement that while the freight under the shipping contract for the carriage originating in one state to pass beyond the state lines becomes the subject of interstate commerce, it does not retain that character beyond the terminus embraced in the contract with the receiving carrier; so that when that shipment ends it must depend for its continuation upon a new agreement between the shipper and the local carrier, and is not, therefore, protected by the interstate commerce clause of the Constitution so as to exempt it from the qualities and liabilities of an intrastate shipment. According to said opinion, when the package in question, brought from Kansas City to Denver, and then rebilled over the Colorado & Southern Railroad and is taken from the latter's cars and delivered to the local defendant railroad company, the party so delivering was not acting as a carrier, but simply as a forwarder for the shipper. The first contract having ended, the shipper "must make a new contract" for carriage over the local road, and, the points of this carriage being wholly within the state, it lost its character of interstate commerce at the point of delivery to the local road, in so far as it is concerned, as it takes it only under its contract evidenced by the new bill of lading, no matter what the purpose of the shipper may have been in starting it from Kansas City. In other words, it is not in the power of the original consignor—the shipper of the goods—to force upon the local state railroad the character of a common carrier of interstate commerce by simply addressing his goods to a point on the local railroad. He may send his goods to Colorado by railroad or by wagon; but when he brings it to the local road, to be carried over its line, wholly within the state, the relation of shipper and carrier is first established by the new contract or bill of lading. It seems to me to be a sufficient answer to the suggestion that, if each railroad company carrying such package over its line to the border of the state may then deliver it to another railroad to be carried over its line to another state border, it would operate as a fraud upon the interstate commerce clause of the Constitution to say this cannot take away the right of the local, independent road, declining to have any joint traffic arrangement with connecting lines, to refuse to take the article except on a new contract of carriage between it and the shipper to be delivered at a point on its own line, according to its own local established rates. The law is a sensible thing. It looks to substance and not to form. Of course, if railroad companies were to resort to the act of rebilling without more, as a mere subterfuge for evading the interstate commerce law of the nation, like any other fraudulent device, the law would disregard it. But there is nothing of this character in the case under review.

It is difficult to escape the conclusion that when the Congress framed the interstate commerce act of 1887 it had in mind the very principle recognized by the court in the Gulf, C. & S. F. Case, supra. For the first time in the history of the national government Congress undertook to prescribe by statute regulations for railroads as common

carriers engaged in interstate commerce. In order that the railroad companies might be advised and understand what would constitute the individual roads carriers of interstate commerce, it defined it as applying to "any common carrier engaged in the transportation of passengers or property, wholly by railroad, or partly by railroad and partly by water when both are used under a common control, management or arrangement, for a continuous carriage or shipment from one state or territory of the United States," etc. Act Feb. 4, 1887, c. 104, § 1, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154]. In view of the knowledge Congress had that in instances this interstate carriage was effected partly by railroads and partly by connecting waterways, it declared that such through continuous lines operated "under a common control, management or arrangement" should be regarded the same as if the carriage were accomplished solely over railroad lines. It has ever been clear to my mind that it was not in the thought of Congress to limit the declaration as to what would constitute such common carrier to the instance of the transportation partly by rail and partly by water. The whole structure and connection of the paragraph do not admit of the restriction sought to be placed upon the act. From that day forth the courts and the railroads have regarded and acted upon the definition of what constitutes such common carrier engaged in interstate commerce.

Mr. Justice Shiras, in Texas & Pacific Railway Company v. Interstate Commerce Commission, 162 U. S. 197, loc. cit. 212, 16 Sup. Ct. 672, 40 L. Ed. 940, after quoting the provision of the interstate commerce act of 1887, said:

"It would be difficult to use language more unmistakably signifying that Congress had in view the whole field of commerce (excepting commerce wholly within a state) as well that between the states and territories as that going to or coming from foreign countries."

Again in Cincinnati, New Orleans & Texas Railway Company v. Interstate Commerce Commission, 162 U. S. 184, 16 Sup. Ct. 700, 40 L. Ed. 935, it was held that the Central Railroad of Georgia was engaged in an act of interstate commerce in transporting, from a given point to another in Georgia, freight originating at Cincinnati, Ohio, destined for Social Circle, Ga.; but that was under a through bill of lading, with a through charge and arrangement for a division of the entire charge among the roads contributing to the movement. But Mr. Justice Shiras, speaking for the court, took occasion to say:

"All we wish to be understood to hold is that when goods shipped under a through bill of lading, from a point in one state to a point in another, are received in transit by a state common carrier, under a conventional division of the charge, such carrier must be deemed to have subjected its road to an arrangement for a continuous carriage or shipment within the meaning of the act to regulate commerce. When we speak of a through bill of lading we refer to the usual method in use by connecting companies, and must not be understood to imply that a common control, management or arrangement might not be otherwise manifested."

Further on he said (pages 191, 192, of 162 U. S., page 703 of 16 Sup. Ct. (40 L. Ed. 935):

"It may be true that the 'Georgia Railroad Company,' as a corporation of the state of Georgia, and whose entire road is within that state, may not be

legally compelled to submit itself to the provisions of the act of Congress, even when carrying, between points in Georgia, freight that has been brought from another state."

The force of the foregoing utterances is not effectually parried by pronouncing them mere obiter dicta. The learned justice was speaking for the whole court. In the one case he was discussing the scope and purport of the interstate commerce act. It was pertinent to the argument leading to the conclusion reached. In the other he was discussing the application of the act to the facts of the case; and lest the language employed might be misunderstood and carried beyond the intendment of the court, he qualified and limited it by the quotation above made, for the express purpose of indicating the mind of the court touching the instance of a carriage without any conventional arrangement for a through shipment on a division of the charges. So when Congress came later to further legislate in the direction of the interstate commerce clause, in line with the jurisdiction assumed in the act of 1887, it is to be assumed that it had in mind its declaration in the former act as to what constituted a common carrier engaged in interstate commerce. In the act of March 2, 1893, which required railroad companies engaged in interstate commerce to equip their locomotives with driving wheel brakes and automatic couplers, it contented itself with designating them simply as "engaged in interstate commerce." The fourth and fifth sections placed the matter under the supervision of the Interstate Commerce Commission; clearly showing that Congress regarded this legislation as allied to and supplementary of the policy inaugurated under the interstate commerce act of 1887. When the act of 1893 was amended in 1896 in respect of safety appliances, Congress again employed the term "any common carrier engaged in interstate commerce by railroad"; and in the sixth section thereof imposed upon the Interstate Commerce Commission the duty of aiding in the enforcement of the prescribed penalty against derelict railroads. The very men who designate themselves as "Inspectors," who discovered this inconsequential, neighborhood road out in the mountains of Boulder county, testified that they were acting under the Interstate Commerce Comsion.

Having in the first act of 1887 clearly defined what constituted such common carrier in interstate commerce, it was deemed sufficient in the additional allied acts to employ the term "any common carrier engaged in interstate commerce by railroad." It dropped the phrase "partly by railroad and partly by water," for the obvious reason that driving wheel brakes and automatic couplers are inapplicable to water carrying vessels.

There is nothing on the face of the Acts of 1893 and 1896 to indicate any purpose, suggested in the majority opinion, to depart from and enlarge upon the conception of Congress as expressed in the original act of 1887 as to what was understood by the terms engaged as a common carrier of interstate commerce by railroad.

The suggestion as to the policy of Congress in the safety appliance act is aptly met by what Mr. Justice Field said in Hadden v. The Collector, 5 Wall., loc. cit. 111, 18 L. Ed. 518:

"What is termed the policy of the government with reference to any particular legislation is generally a very uncertain thing, upon which all sorts of opinions, each variant from the other, may be formed by different persons. It is a ground much too unstable upon which to rest the judgment of the court in the interpretation of statutes."

The philanthropic feature of this prosecution is but the rose in the mailed hand.