GOODRICH TRANSIT CO. v. INTERSTATE COMMERCE COMMISSION
(UNITED STATES, Intervener).

WHITE STAR LINE v. UNITED STATES (INTERSTATE COMMERCE
COMMISSION, Intervener).

(Commerce Court.  October 5, 1911.)

Nos. 21–24.

1. STATUTES (§ 217*)—CONSTRUCTION—EXTRINSIC AIDS—HISTORY OF PASSAGE
OF ACT.

It is proper for courts to review the proceedings connected with the
passage of a law through the legislative houses, as bearing on the cor-
rect interpretation of the text used.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. § 293; Dec. Dig.
§ 217.*

History and passage of statutes and contemporaneous circumstances
as aids to construction, see note to Morle v. Bidwell, 65 C. C. A. 535.]

2. COMMERCE (§ 85*)—JURISDICTION OF INTERSTATE COMMERCE COMMISSION—
CARRERS BY WATER.

It was not the purpose of Interstate Commerce Act Feb. 4, 1887,
c. 104, 24 Stat. 379 (U. S. Comp. St. 1901, p. 3154), either as originally
passed or as since amended, to subject independent carriers by water
to its provisions, and it does not vest the Interstate Commerce Com-
mission with any control over the business of such carriers, except such
interstate traffic as is carried on under a joint arrangement with rail
carriers.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 85.*]

3. COMMERCE (§ 85*)—JURISDICTION OF INTERSTATE COMMERCE COMMISSION—
REGULATION OF CARRIERS BY WATER—REPORTS AND FORMS OF ACCOUNT-
ING—"COMMON ARRANGEMENT."

A steamship company, which joins with a railroad carrier in mak-
ing, filing, and publishing joint through rates for interstate traffic, is as
to such traffic used under a "common arrangement" with the railroad com-
pany, within the meaning of Interstate Commerce Act Feb. 4, 1887, c. 104,
§ 1, 24 Stat. 379 (U. S. Comp. St. 1901, p. 3154), as amended by Act June
29, 1906, c. 3591, § 1, 34 Stat. 584 (U. S. Comp. St. Supp. 1909, p. 1150), and
subject to regulation and control by the Interstate Commerce Commis-
sion; but such power to regulate and control does not extend to the other
port-to-port business of the company, whether interstate or intrastate.
Under section 20 of the act as so amended, and as further amended by
Act June 18, 1910, c. 309, § 14, 36 Stat. 555, the Commission has power
to require reports from such company, and to prescribe a system of
bookkeeping and accounting with respect to such joint traffic and di-
rectly relating thereto, but it has no power to extend such requirements
to include other matters or business of the company having no direct re-
lation to such joint traffic.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 85.*]

Two petitions by the Goodrich Transit Company against the Inter-
state Commerce Commission, the United States intervening, and two
petitions by the White Star Line against the United States, the Inter-
state Commerce Commission intervening; the relief sought being in-
junctions to restrain enforcement of orders made by the Interstate
Commerce Commission.   On demurrers to petitions and motions to
dismiss.   Demurrers and motions overruled, and injunctions granted.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Ralph M. Shaw, for petitioners.

J. A. Fowler, Asst. Atty. Gen., and Charles W. Needham, for respondents.

Before KNAPP, Presiding Judge, and ARCHBALD, CARLAND, HUNT, and MACK, Associate Judges.

### No. 21.

HUNT, Judge. The Goodrich Transit Company, a corporation organized under the laws of Maine, filed this bill in equity on December 29, 1910, in the Circuit Court of the United States for the Northern District of Illinois, Eastern Division, to obtain an injunction against the enforcement of certain orders of the Interstate Commerce Commission. For the sake of brevity, we will hereafter refer to the Goodrich Transit Company as the Transit Company and to the Interstate Commerce Commission as the Commission.

It appears from the bill that the Transit Company has its principal operating office in Chicago, Ill., and since its organization in 1906 has been engaged in the transportation of passengers and freight on Lake Michigan, Lake Huron, and the rivers tributary thereto. It owns and operates steamers and dock properties in Illinois, Wisconsin, and Michigan; several of such dock properties being near the mouths of rivers. The docks are used as landing places, where freight and passengers are discharged and taken off. The steamers carry passengers and freight originating at ports of the states of Michigan, Wisconsin, and Illinois, and destined to ports in each of the said states. This transportation is entirely by water, and unconnected with any land transportation whatever, and·is spoken of as "port-to-port interstate business." The Transit Company's steamers also carry passengers and freight originating at and destined to ports in the same state. and not passing out of said state en route, and this business is spoken of as "port-to-port intrastate business."

The bill alleges that the Transit Company had voluntarily agreed with some of the interstate railroad carriers of the United States to establish certain through routes over which passengers and freight were being carried under joint tariffs, and that for the purpose of establishing such through routes it had voluntarily filed with the Commission its joint tariffs or its concurrence in tariffs filed by such railroad carriers, and that the Transit Company's steamers carry for hire passengers and freight under said joint tariffs over the water portion of said through routes. It is alleged with some detail that the principal part of the business of the Transit Company is derived from its port-to-port and intrastate business, and that competition is active and open to any who may desire to engage in such business, which includes the privilege of the use of docking and terminal facilities. The bill alleges that on June 11, 1910, the Commission entered the following order:

"It is ordered, that Special Report Series Circular No. 10, prepared under the direction of this Commission by Henry C. Adams, in charge of statistics and accounts, be, and the same is hereby, approved; that a copy of the said Special Report Series Circular No. 10 be sent to each and every car-

rier by water within the jurisdiction of this Commission; that each and every of the said carriers by water be required to make full and true answers to the several inquiries contained in the said Special Report Series Circular No. 10, and to verify its said answers by the oath of the president or other principal officer of such company; and that the said oath be in the form provided in the said Special Report Series Circular No. 10."

Attached to the petitioner's bill is a copy of the Special Report Series Circular No. 10, referred to in the order of the Commission, dated June 11, 1910, to which said special report we shall have occasion hereafter to refer.

Service of the order is alleged to have been made, and notification was given that, unless answers to the questions propounded in the special report were made before December 31, 1910, the Transit Company would be liable to the penalties prescribed in section 20 of the act to regulate commerce, as amended by the act approved June 18, 1910.

The petitioner avers that the interrogatories contained in the special report just referred to made no distinction between the business transacted by the Transit Company, which was solely intrastate business, and that transacted which was wholly port-to-port business, and that which was the result of joint rail and water routes, to which the Transit Company became a voluntary party; and it is alleged that, inasmuch as the Transit Company had voluntarily become a party to the joint rail and water routes referred to, the Commission insisted that it had jurisdiction over all the business of the Transit Company, without regard to its nature or the places between which it was transacted. The bill sets up that since the creation of the Commission, in 1887, never, prior to the entry of the order above referred to, had the Commission required any reports from water carriers generally, or any report of any kind from this particular petitioner.

It is further alleged that the Commission, on January 7, 1909, construed the act to regulate commerce as subjecting carriers of interstate commerce by water to the provisions of the act only in respect to traffic transported under a common control, management, or arrangement with a rail carrier.

It is set forth that the inquiries made by the Commission were not for the purpose of exacting evidence under any complaint filed for violation of the act to regulate commerce, or for the purpose of making investigations that might have been the object of a complaint, that a large number of the questions propounded in the special report called for pertained solely to the internal affairs of the company, and that it is impossible to answer them without reporting to the Commission details in connection with the internal management of the business of the Transit Company; and it is pleaded that the Commission has no constitutional authority to regulate or to inquire into the internal affairs of the Transit Company, and is without power to regulate commerce which is wholly intrastate or to make inquiries respecting commerce which is wholly intrastate.

The order of the Commission is alleged to be void because of lack of power in the Commission, and because to enforce the order would be a violation of the fourth amendment to the Constitution of the

United States, prohibiting unreasonable searches or seizures, and because the information sought by the inquiries is a property right, and because to enforce the order of the Commission would be to take the property of the Transit Company without compensation and without due process of law.

The relief prayed for is an interlocutory order suspending the order of the Commission and restraining that body from taking any steps to enforce the order, and that upon final hearing the order of the Commission should be annulled. There is a further prayer to the effect that if, however, it should be found that the Commission had authority to require an answer to any of the questions contained in the Report No. 10, referred to, upon final hearing the court would enter an order specifically designating such questions in said report as the Commission could lawfully require to be answered, and that the Commission be restrained from attempting to enforce answers to any questions not included in the designation made by the court.

The Commission interposed a demurrer, based upon the ground that the bill failed to state any equity. The Circuit Court for the Northern District of Illinois, Eastern Division, upon December 31, 1910, stayed the order of the Commission until the further order of the court.

After the opening of the United States Commerce Court, and pursuant to section 6 of the act to create the said court (Act June 18, 1910, c. 309, 36 Stat. 544), the case was transferred, and is now here to be proceeded with as may be proper.

By leave had the United States has intervened and filed an answer, admitting the allegations of fact contained in the bill, but setting forth that the requirements made by the orders of the Commission do not make distinction between the books which petitioner might keep and its method of accounting for its income and expenses in connection with its interstate business and its port-to-port business, as separate from its business as a result of its joint rail and water routes, because (1) while the income from each of the different kinds of business stated in the bill can be ascertained with reasonable accuracy, yet it is impossible to determine with any substantial degree of accuracy the expenses incurred in either of them, as separate and distinct from those incurred in the others, and (2) because it is essential that the Commission be informed as to the total income derived by the Transit Company, in order that the Commission may determine what are reasonable and just rates to be charged by petitioner in its joint rail and water business, and to determine whether it complies with the provisions of the law regulating interstate commerce.

The United States also sets up that the system of bookkeeping devised by the Commission is the result of long experience, and well adapted to the preservation of data for the information of the Commission, and that in the absence of a method prescribed by the Commission a carrier might manipulate its books and reports in a way to conceal rather than to reveal the true state of its business, and that it is of vital importance to the Commission to have the information called for in the order, in order that it may perform its duties as provided by the terms of the act to regulate commerce.

## No. 22.

This suit was also brought in the Circuit Court of the United States for the Northern District of Illinois, Eastern Division.

The Goodrich Transit Company, the same corporation referred to in case No. 21, after alleging substantially the same matters with respect to its incorporation and business as it had set forth in the averments in the the bill filed in case No. 21, alleges that on May 31, 1910, the Interstate Commerce Commission, acting under the authority claimed under section 20 of the act to regulate commerce, approved June 16, 1906, entered two certain orders relating to the subject of a uniform system of accounts to be prescribed for and kept by carriers by water. One of the orders prescribed that the classification of operating revenue of such carriers and the text pertaining thereto, prepared under the direction of the Commission, should govern in the keeping and recording of operating revenue accounts, and that the rules contained in what was known as the first issue of the classification of operating revenues of carriers by water should apply to the keeping and recording of such operating accounts, and that it should be unlawful for any such water carrier, or for any person directly in charge of the accounts of such carrier, to keep any account or record or memorandum of any operating revenue items, except in the manner and form as set forth and prescribed, and except as authorized by the Commission.

It was further ordered that any such carrier might subdivide any primary account in the first issue as might be required for the purposes of such carrier, or might make any assignment of the amount credited to any such primary account of operating divisions to its individual lines or estates, provided that a list of such subprimary accounts set up or such assignments made by any such carrier should be first filed in the office of the Commission. The order also provided that the carrier, in addition to the operating revenue accounts prescribed by the Commission, might keep any temporary or experimental accounts, the purpose of which should be to develop the efficiency of operation, but that such temporary or experimental accounts should not impair the integrity of any general or primary account prescribed by the order of the Commission. January 1, 1911, was the date upon which the order was to become effective.

The other order made was with respect to the classification of operating expenses of carriers by water. Classification was to be made pursuant to rules prescribed by the Commission and embodied in a printed form known as the first issue. It was ordered that the classification of operating expenses as prescribed should govern in keeping and recording operating expense accounts, and that the rules prescribed should be those according to which the operating expenses are defined; and the carriers were required to conform to the rules, and it was made unlawful for carriers to keep any accounts or records or memoranda of any operating expense item, except as set forth and prescribed in the manner and form laid down in the pamphlet called the "first issue." The carriers were authorized to subdivide any primary accounts as might be required for the purposes of such

carrier, or might make certain assignments of the amount charged to such primary account, provided that a list of such subprimary accounts or assignments should be first filed with the Commission. Authority was also given to the carrier to keep any temporary or experimental accounts, the purpose of which was to develop the efficiency of operation; but such temporary or experimental accounts were not to impair the integrity of any general or primary accounts as prescribed by the Commission, and such temporary or experimental accounts were required to be open for inspection by the Commission. The date upon which this order was to be effective was January 1, 1911.

The petitioner alleges that two pamphlets, one entitled "The Classification of Operating Revenues of Carriers by Water as Prescribed by the Interstate Commerce Commission," etc., and the other of which was entitled "The Classification of Operating Expenses of Carriers by Water, as Prescribed by the Interstate Commerce Commission," etc., were served upon it, and it is alleged that the bookkeeping methods prescribed by the order of the Commission differ widely from those used by petitioner, and that, in order to comply with the requirements of the Commission, petitioner will have to open a completely new set of books and change its methods of accounting, all of which would entail annoyance and expense.

It is averred that the Commission has notified the petitioner that, beginning with January 1, 1911, a new set of books must be opened, which must conform to the methods prescribed with respect to all of its business, including its intrastate business, its port-to-port interstate business, and its business as a part of joint routes with rail carriers, and that, in the event of a failure to conform its books and methods of accounting to the requirements prescribed, it will be subject to the penalties prescribed in section 20 of the act to regulate commerce.

Petitioner avers that the requirements make no distinction between the books which petitioner may keep and its method of accounting for its income and expenses in connection with its intrastate business, its port-to-port business, and the business which is transacted by petitioner as the result of the joint rail and water routes to which the petitioner has become voluntarily a party. It is averred that the act to regulate commerce, as amended in June, 1906, conferred upon the Commission the same authority that it now claims to exercise with respect to the books and accounts of water carriers generally, and that, though petitioner and other water carriers have voluntarily agreed with some interstate carriers by railroad to establish a limited number of through routes over which passengers or property have been transported by a continuous carriage, and have filed tariffs therefor with the Interstate Commerce Commission, yet the Commission never before has claimed that petitioner or other water carriers subjected themselves to all of the provisions of the act to regulate commerce or the provisions of section 20 thereof.

It is alleged that under the Constitution of the United States no power was conferred upon Congress to regulate in any method whatsoever the internal affairs of any corporation organized under the laws

of a state, and that no power was conferred upon Congress to delegate to the Commission the right to regulate in any method whatsoever the internal affairs of any corporation organized under the laws of a state, and that no power was conferred upon Congress to regulate any commerce which is wholly intrastate, and that Congress did not confer upon the Commission the right to regulate all or any part of the business of petitioner which was solely port-to-port business, either interstate or intrastate, and that the Commission is without power to prescribe the bookkeeping methods of petitioner with respect either to its intrastate business or its port-to-port business.

Petitioner, while denying that either the Congress or the Commission has any authority over the bookkeeping methods of petitioner with respect either to its income or its disbursements, avers that such jurisdiction, if any, as the Commission has over the bookkeeping methods of petitioner is limited solely to bookkeeping methods with respect to the income and disbursements of petitioner in connection with its joint rail and water business, and that the methods prescribed by the Commission are not reasonably adapted to the purpose of furnishing to the Commission any information with respect to the revenue or disbursements of petitioner relating to its joint rail and water business.

It is also alleged that the methods prescribed would not enable the Commission to pass upon the justness or fairness of any existing or proposed rate, classification, or practice of petitioner in connection with its joint rail and water business, or in connection with the existence or establishment of any through route, joint classification, or division of receipts upon such joint rail and water business.

It is further averred that it is possible to establish a method of bookkeeping by means of which the income and disbursements from the joint rail and water business of petitioner would be segregated, and that by the methods prescribed in the orders provision is not made for the segregation of the joint rail and water business from the petitioner's port-to-port business or intrastate business.

It is also averred that the right of the petitioner to keep its books in a way which shall seem to it appropriate is a property right, and that the deprivation of such right is a violation of the fifth amendment to the Constitution of the United States.

It is alleged that the orders as made are not regulations of interstate commerce, and that if section 20 of the act to regulate commerce is construed as it has been by the Commission it will be the taking of petitioner's property without compensation and without due process of law.

The prayer is that a temporary order may be entered, suspending the orders of the Commission, and restraining the Commission from taking any steps to enforce the orders, and that upon final hearing decree may be entered annulling and suspending the said orders and enjoining the Commission from taking any steps toward the enforcement of said orders. A further prayer is that if, in the judgment of the court, the orders of the Commission are lawful in any respect, the court shall say what requirements petitioner shall be obliged to live up to, and that injunction be issued restraining the Commission

from enforcing the order with respect to any matters not lawfully included within the order of the court.

The Commission demurred to the petition, the demurrer being based upon the ground that the bill failed to state any equity and that the allegations did not show that the legislative department of the government was without authority to grant the power exercised by the Commission in making the orders of May 31, 1910, and that the petition does not show that there is any violation of any constitutional or other right of the petitioner.

The United States filed an answer, admitting every allegation of fact contained in the petition, except as follows: It admits that, while no distinction has been made between petitioner's income and expenses in connection with its interstate business and intrastate business, such distinction was not made because while the income from the different kinds of business stated in the petition can with reasonable accuracy be ascertained, yet it is impossible to determine with any substantial degree of accuracy the expenses incurred in either of said kinds of business as separate and distinct from the others, and because it is essential that the Commission know the total income derived by petitioner from all it investments and sources, in order that the Commission may determine what are reasonable and just rates to be charged by petitioner in its joint rail and water business, and to determine whether it is complying with the provisions regulating interstate commerce. The answer, while expressly admitting allegations of fact contained in the petition, does not admit, but denies, inferences of fact from particular facts alleged and conclusions of law insisted upon in the petition.

The Circuit Court of the Northern District of Illinois stayed the order of the Commission, and the case, like No. 21, was thereafter transferred to this court.

### No. 23 and No. 24.

These are petitions filed originally in this court by the White Star Line against the United States, wherein petitioner attacks the validity of the same orders specified in the two preceding cases, and seeks to restrain their enforcement. The allegations of the petitions are very similar to those already set forth in the petitions of the Goodrich Transit Company. It is averred herein, however, that the White Star Line, in addition to its transportation business, owns two amusement parks, both situated within the state of Michigan; that in connection with the said parks it owns, operates, and derives revenue from lunch stands, merry-go-rounds, bowling alleys, bathhouses, souvenir stands, photograph stands, boat liveries, and launch ferries, and that admission fees are collected from people who enter said amusement parks. The petitioner alleges that the Commission had no power to regulate the books or to demand the reports which were kept with respect to the conduct of its amusement parks, the business of keeping said parks being separate and distinct from the transportation business of the petitioner.

It appears that the White Star Line owns and operates steamers which run from Toledo, Ohio, through Lake Erie, Detroit river, Lake

St. Clair, and St. Clair river to Port Huron, in Michigan. The steamers stop to load and unload passengers and freight at many points in the state of Michigan and in the Dominion of Canada, between Toledo and Port Huron. The transportation is entirely by water and unconnected with any land transportation whatever; but it is alleged that the petitioner has voluntarily agreed with some of the interstate railroad carriers of the United States to establish certain through routes over which passengers and freight are carried under joint tariffs, and that for the purpose of establishing such through routes it has voluntarily filed with the Commission its joint tariffs or its concurrence in tariffs filed by said railroad carriers, and that the steamers of the petitioner carry for hire passengers and freight under said joint tariffs over the water portion of said through routes.

The orders of the Commission, as in the cases Nos. 21 and 22, relate to the making of reports to the Commission, and to the keeping of uniform accounts, as required by the rules laid down by the Commission, and to which reference has already been made in the statement of the two preceding cases.

The petitioner in these cases, as in the preceding ones, avers that the Commission caused to be served upon it two pamphlets, one entitled "The Classification of Operating Revenues by Carriers by Water" and the other entitled "The Classification of Operating Expenses of Carriers by Water." It is alleged that the bookkeeping methods prescribed by the Commission differ from those used by the petitioner, and that in order to comply with the order of the Commission petitioner would have to open a completely new set of books and change its methods of accounting.

It is also alleged that the requirements include the business of petitioner relating to its amusement parks, its intrastate business, its port-to-port intrastate and international business, and its business as a part of joint routes with rail carriers. Petitioner denies the authority of the Commission to make any such orders, and for reasons substantially similar to those relied upon in the bills filed by the Goodrich Transit Company, already referred to, pleads lack of power in the Commission, and assails the constitutionality of the orders.

The United States filed answers to the petitions, admitting the allegations of fact contained in the petitions, but alleging that the parks and things connected with the parks constitute a part of the petitioner's general property, and are operated in connection with and for the purpose of promoting its interstate business. The answers also set up that the method of bookkeeping prescribed by the Commission is reasonable and just, and that it is impossible to determine what are reasonable and just rates to be charged by petitioner in its joint rail and water business unless a method of bookkeeping such as is prescribed is put into use.

The Interstate Commerce Commission filed motions to dismiss the several petitions upon the ground that the facts stated therein do not entitle petitioner to any relief.

The four cases were argued together, upon an understanding between counsel for the respective parties that the essential questions were presented by the demurrers and motions to dismiss. The cases

were, therefore, heard as upon general demurrers and motions, and without regard to the answers filed by the United States.

This statement is sufficient to an understanding of the cases, and although there are separate records, we shall treat them as if they were but one proceeding before the court.

The Commission made its call for the reports and its orders prescribing uniformity of accounts, which are objected to by the carriers, under what it claims is authority conferred by section 20 of the act to regulate commerce. The section is appended.[1] Acting under its terms the Commission in detail has prescribed classification of operating expenses and revenue accounts for the use of carriers by water and has prescribed that the accounts for the entire operations of such carriers shall be kept according to a uniform system laid out by definite rules of the Commission.

In the classification as prescribed for the report, operating expenses are divided into certain general accounts, such as maintenance, traf-

[1] Sec. 20. (As amended June 29, 1906, February 25, 1909, and June 18, 1910.) That the Commission is hereby authorized to require annual reports from all common carriers subject to the provisions of this act, and from the owners of all railroads engaged in interstate commerce as defined in this act; to prescribe the manner in which such reports shall be made, and to require from such carriers specific answers to all questions upon which the Commission may need information. Such annual reports shall show in detail the amount of capital stock issued, the amounts paid therefor, and the manner of payment for the same; the dividends paid, the surplus fund, if any, and the number of stockholders; the funded and floating debts and the interest paid thereon; the cost and value of the carrier's property, franchises, and equipments; the number of employés; the salaries paid each class; the accidents to passengers, employés, and other persons, and the causes thereof; the amounts expended for improvements each year, how expended, and the character of such improvements; the earnings and receipts from each branch of business and from all sources; the operating and other expenses; the balances of profit and loss; and a complete exhibit of the financial operations of the carrier each year, including an annual balance sheet. Such reports shall also contain such information in relation to rates or regulations concerning fares or freights, or agreements, arrangements, or contracts affecting the same as the Commission may require; and the Commission may, in its discretion, for the purpose of enabling it the better to carry out the purposes of this act, prescribe a period of time within which all common carriers subject to the provisions of this act shall have, as near as may be, a uniform system of accounts, and the manner in which such accounts shall be kept.

Said detailed reports shall contain all the required statistics for the period of twelve months ending on the thirtieth day of June in each year, or on the thirty-first day of December in each year if the Commission by order substitute that period for the year ending June thirtieth, and shall be made out under oath and filed with the Commission at its office in Washington within three months after the close of the year for which the report is made, unless additional time be granted in any case by the Commission; and if any carrier, person, or corporation subject to the provisions of this act shall fail to make and file said annual reports within the time above specified, or within the time extended by the Commission, for making and filing the same, or shall fail to make specific answer to any question authorized by the provisions of this section within thirty days from the time it is lawfully required so to do, such party shall forfeit to the United States the sum of one hundred dollars for each and every day it shall continue to be in default with respect thereto. The Commission shall also have authority by general or special orders to require said carriers, or any of them, to file

fic expenses, operation of vessels and terminals, incidental transportation expenses, general expenses, and charter expenses. Under these several heads accounts of expenditures are required to be divided into groups and the groups in turn are divided into primary detailed accounts. For example, the report of traffic expenses calls for accounts of superintendence, advertising, fast freight lines, outside agencies, traffic associations, and other traffic expenses. Expenditures chargeable to transportation expenses are required to be divided into general groups under the headings: "Operation of Vessels," "Operation of Terminals," and "Incidental Transportation Expenses." Primary accounts which go to make up the items under the general heading are called for with specific detail, to the end that classifications of operating expenses for carriers by water may be presented by an account of the entire transactions of the carrier whose business is being inquired into. The classification of operating revenues is equally specific, requiring accounts of revenue from transportation, revenue from

monthly reports of earnings and expenses, and to file periodical or special, or both periodical and special, reports concerning any matters about which the Commission is authorized or required by this or any other law to inquire or to keep itself informed or which it is required to enforce; and such periodical or special reports shall be under oath whenever the Commission so requires; and if any such carrier shall fail to make and file any such periodical or special report within the time fixed by the Commission, it shall be subject to the forfeitures last above provided.

Said forfeitures shall be recovered in the manner provided for the recovery of forfeitures under the provisions of this act.

The oath required by this section may be taken before any person authorized to administer an oath by the laws of the state in which the same is taken.

The Commission may, in its discretion, prescribe the forms of any and all accounts, records, and memoranda to be kept by carriers subject to the provisions of this act, including the accounts, records, and memoranda of the movement of traffic, as well as the receipts and expenditures of moneys. The Commission shall at all times have access to all accounts, records, and memoranda kept by carriers subject to this act, and it shall be unlawful for such carriers to keep any other accounts, records, or memoranda than those prescribed or approved by the Commission, and it may employ special agents or examiners, who shall have authority under the order of the Commission to inspect and examine any and all accounts, records, and memoranda kept by such carriers. This provision shall apply to receivers or carriers and operating trustees.

In case of failure or refusal on the part of any such carrier, receiver, or trustee to keep such accounts, records, and memoranda on the books and in the manner prescribed by the Commission, or to submit such accounts, records, and memoranda as are kept to the inspection of the Commission or any of its authorized agents or examiners, such carrier, receiver, or trustee shall forfeit to the United States the sum of five hundred dollars for each such offense and for each and every day of the continuance of such offense, such forfeitures to be recoverable in the same manner as other forfeitures provided for in this act.

Any person who shall willfully make any false entry in the accounts of any book of accounts or in any record or memoranda kept by a carrier, or who shall willfully destroy, mutilate, alter, or by any other means or device falsify the record of any such account, record, or memoranda, or who shall willfully neglect or fail to make full, true, and correct entries in such accounts, records, or memoranda of all facts and transactions appertaining to the carrier's business, or shall keep any other accounts, records, or memoranda than those prescribed or approved by the Commission, shall be deemed guilty of a misdemeanor, and shall be subject, upon conviction in any

operations other than transportation, and charter revenue. Primary accounts must be kept and made of passenger, baggage, mail, express revenue, and miscellaneous receipts, including, among many other things, wharf, demurrage, storage, and other receipts.

Interrogatories also call for exact information as to the amount of capital stock issued, dividends paid, surplus funds, if any, funded and floating debt, and interest thereon, cost and value of the carriers' property, franchises, and equipments, earnings and receipts from each branch of business and from all sources, operating and other expenses, complete exhibits of financial operations, as well as other complete statements necessary to exhibit the carriers' financial condition and results from operation of their entire business.

In the text of classification of operating revenues in the "first issue" pamphlet, particularly referred to in the petition filed in case No. 22, the carrier is called upon to keep an account of its freight revenue, passenger revenue, excess baggage, and other passenger rev-

court of the United States of competent jurisdiction, to a fine of not less than one thousand dollars nor more than five thousand dollars, or imprisonment for a term not less than one year nor more than three years, or both such fine and imprisonment: Provided, that the Commission may, in its discretion, issue orders specifying such operating, accounting, or financial papers, records, books, blanks, tickets, stubs, or documents of carriers which may, after a reasonable time, be destroyed, and prescribing the length of time such books, papers, or documents shall be preserved.

Any examiner who divulges any fact or information which may come to his knowledge during the course of such examination, except in so far as he may be directed by the Commission, or by a court or judge thereof, shall be subject, upon conviction in any court of the United States of competent jurisdiction, to a fine of not more than five thousand dollars or imprisonment for a term not exceeding two years, or both.

That the Circuit and District Courts of the United States shall have jurisdiction, upon the application of the Attorney General of the United States, at the request of the Commission, alleging a failure to comply with or a violation of any of the provisions of said act to regulate commerce or of any act supplementary thereto or amendatory thereof by any common carrier, to issue a writ or writs of mandamus commanding such common carrier to comply with the provisions of said acts or any of them.

And to carry out and give effect to the provisions of said acts, or any of them, the Commission is hereby authorized to employ special agents or examiners, who shall have power to administer oaths, examine witnesses, and receive evidence.

That any common carrier, railroad, or transportation company receiving property for transportation from a point in one state to a point in another state shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass, and no contract, receipt, rule, or regulation shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed: Provided, that nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under existing law.

That the common carrier, railroad, or transportation company issuing such receipt or bill of lading shall be entitled to recover from the common carrier, railroad, or transportation company on whose line the loss, damage, or injury shall have been sustained the amount of such loss, damage, or injury as it may be required to pay to the owners of such property, as may be evidenced by any receipt, judgment, or transcript thereof.

enues, together with mail, express, special service, miscellaneous transportation revenues, freight operations other than transportation, rentals of buildings, and miscellaneous receipts. In the classification of operating expenses, the orders require accounts of superintendence, repairs of vessels, renewals, repairs of tugs and lighters, accounts of shop machinery and tools, maintenance of equipment, maintenance of terminals, expenses of docks, wharves, buildings, and fixtures, traffic expenses, transportation expenses, wages of crews, fuel, food supplies, operation of terminals, salaries of agents, clerks, and attendants, stevedore and wharf laborer accounts, freight losses and damages, accounts of damage to property, salaries and expenses of general officers, law expenses, insurance, charter expenses, including rent, maintenance, and operation accounts for hire or rent of vessels, and other matters.

No attempt is made, in the orders making classifications of accounts and laying down forms, to separate revenues or expenses of operations on traffic which is interstate from that which is intrastate; the object being to require a report of and to prescribe accounting rules for the entire business of any carrier that is subject with respect to any of its traffic to the provisions of the act.

So, without further particularization of the many items of information called for by the questions which are submitted to the carrier in the report, and without examining more closely into the precise methods of the system adopted to secure uniformity of accounts therein, we may put the fundamental question of law presented in this way: What authority, if any, has the Commission over water carriers situated as are these now before the court?

At the outset we recognize the force of the suggestion made by petitioners that for a great many years the regulation of commerce on the ocean and other navigable waters, including the regulation of water carriers, has been provided for by laws especially adapted to that particular subject. Thus it was enacted that the liability of owners of vessels for the loss or destruction of property, goods or merchandise, done, occasioned, or incurred without the privity or knowledge of the owner, shall in no case exceed the amount or value of the interest of such owner in such vessel and her freight then pending (Rev. Stat. § 4283 [U. S. Comp. St. 1901, p. 2943]); and by Act June 26, 1884, c. 121, § 18, 23 Stat. 57 (U. S. Comp. St. 1901, p. 2945), amending section 4283, the individual liability of a shipowner is limited to the proportion of any or all debts and liabilities that his individual share of the vessel bears to the whole, and the aggregate liabilities of all the owners of a vessel on account of the same shall not exceed the value of such vessel and freight pending. Again, by section 3 of the act of Congress approved February 13, 1893 (27 Stat. 445, c. 105 [U. S. Comp. St. 1901, p. 2946]), it is provided that:

"* * * If the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped, and supplied, neither the vessel, her owner or owners, agent or charterers, shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel. * * *"

And in 1873 Congress passed an act which prohibited railways forming part of an interstate line and vessels transporting cattle and other animals from state to state from confining the same in cars, boats, or vessels for more than 28 hours consecutively without releasing the same for water, rest, and feeding for at least 5 consecutive hours. Rev. Stat. § 4386 (U. S. Comp. St. 1901, p. 2996).

But while these statutory provisions, in so far as they go, are a regulation of commerce and carriage by water and of the limitations upon vessel owners' liabilities passed by Congress under its general power to regulate commerce (Providence & New York Steamship Co. v. Hill Manufacturing Co., 109 U. S. 578, 3 Sup. Ct. 379, 617, 27 L. Ed. 1038; Lord v. Steamship Co., 102 U. S. 541, 26 L. Ed. 224), still they do not attempt to control rates, fares, or charges relating to such transportation. And, so far as we are advised, not until April, 1887, the time when the act to regulate commerce became effective, did Congress make reference to the regulation of rates. Upon this assumption we may refer briefly to the history and scope of the act to regulate commerce, to see whether Congress, in establishing a system by which interstate transportation should be regulated, included water carriers and charges for service and accounting by water carriers. It is well here to note that by the amendments of the act to regulate commerce passed June 18, 1910, the Interstate Commerce Commission was expressly denied the right to establish any route classification, rate, fare, or charge when the transportation is wholly by water, and that any transportation by water affected by the act to regulate commerce should be subject to the laws and regulations applicable to transportation by water.

[1] Although courts may not refer to the debates in Congress to enable them to discover the meaning of the language of an act of Congress, nevertheless it is proper for them to review the proceedings connected with the passage of a law through the legislative houses, in order to get at the correct interpretation of the text used. United States v. Trans-Missouri Freight Association, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007.

[2] The initial legislative step taken to secure a law regulating carriers was the adoption of a resolution on March 17, 1885, authorizing the President of the Senate to appoint a committee to investigate into and report upon the subject of "the regulation of transportation by railroad, and water routes in connection or competition with said railroads, of freight and passengers between the several states, etc." On January 18, 1886, the committee made an exhaustive report, wherein were pointed out the then existing evils in railroad operation, together with possible remedies therefor, and a bill was recommended for passage. In the report special emphasis was laid upon the influence of water routes as beneficially regulating charges made upon all other means of transit; the conclusion of the committee being that, in order "to secure the blessings of cheap transportation and to hold our place among the nations of the earth, we must develop our natural waterways to their fullest capacity, and give the benefits of lake, river, and canal communication to the people of all the states as far as prac-

ticable." The law as approved February 4, 1887, to be effective April 5, 1887, contained the following paragraph, numbered 1:

"* * * That the provisions of this act shall apply to any common carrier or carriers engaged in the transportation of passengers or property wholly by railroad, or partly by railroad and partly by water when both are used, under a common control, management, or arrangement, for a continuous carriage or shipment from one state or territory of the United States, or the District of Columbia, to any other state or territory of the United States, or the District of Columbia, or from any place in the United States to an adjacent foreign country, or from any place in the United States through a foreign country to any other place in the United States, and also to the transportation in like manner of property shipped from any place in the United States to a foreign country and carried from such place to a port of transshipment, or shipped from a foreign country to any place in the United States and carried to such place from a port of entry either in the United States or an adjacent foreign country: Provided, however, that the provisions of this act shall not apply to the transportation of passengers or property, or to the receiving, delivering, storage, or handling of property, wholly within one state, and not shipped to or from a foreign country from or to any state or territory as aforesaid."

Amendments to this section made in June, 1906, removed doubt as to what constituted the test of jurisdiction by changing the punctuation so as to make the provisions of the act apply to "any common carrier or carriers engaged in the transportation of passengers or property wholly by railroad (or partly by railroad and partly by water when both are used under a common control, management, or arrangement for a continuous carriage or shipment), from one state or territory" etc. The effect of the parentheses was to make the words "common control, management, or arrangement" applicable only to transportation which is partly by railroad and partly by water. We do not regard the change as of special importance to this case further than that it shows that Congress consistently meant to keep within the transportation over which it would exercise a measure of control, not alone interstate traffic by all-rail route, but interstate traffic in part by water when used in connection with rail under a common control, management, or arrangement for a continuous carriage or shipment.

It is undoubtedly true that in the exercise of its power over interstate commerce the principal moving thought of Congress was to regulate railroad corporations. Commonly known practices of unjust discrimination in various forms by railroads had led to many evils, which, owing to the restricted powers of the states, could only be effectively dealt with through general law. The decision of the Supreme Court in Wabash, St. Louis & Pacific Railway Co. v. Illinois, 118 U. S. 557, 7 Sup. Ct. 4, 30 L. Ed. 244, rendered in October, 1886, to the effect that a statute of a state attempting to regulate or to impose any restriction upon the transmission of persons or property from one state to another is not within the class of legislation which the states may enact in the absence of legislation by Congress, and that such a statute is void even as to that part of such transmission which may be within the state, reversing the decision of the Supreme Court of Illinois, helped to draw public attention to the situation and quickened the demand for congressional action.

Mentioning the causes which led to action by Congress, the Su-

preme Court, in Texas & Pacific Railway Co. v. Interstate Commerce Commission, 162 U. S. 197, 210, 16 Sup. Ct. 666, 672 (40 L. Ed. 940), said:

" * * * They chiefly grew out of the use of railroads as the principal modern instrumentality of commerce. While shippers of merchandise are under no legal necessity to use railroads, they are so practically. The demand for speedy and prompt movement virtually forbids the employment of slow and old-fashioned methods of transportation, at least in the case of the more valuable articles of traffic. At the same time, the immense outlay of money required to build and maintain railroads, and the necessity of resorting, in securing the rights of way. to the power of eminent domain, in effect disable individual merchants and shippers from themselves providing such means of carriage. From the very nature of the case, therefore, railroads are monopolies, and the evils that usually accompany monopolies soon began to show themselves, and were the cause of loud complaints. The companies owning the railroads were charged, and sometimes truthfully, with making unjust discriminations between shippers and localities, with making secret agreements with some to the detriment of other patrons, and with making pools or combinations with each other, leading to oppression of entire communities.

"Some of these mischiefs were partially remedied by special provisions inserted in the charters of the companies and by general enactments by the several states, such as clauses restricting the rates of toll, and forbidding railroad companies from becoming concerned in the sale or production of articles carried, and from making unjust preferences. Relief, to some extent, was likewise found in the action of the courts in enforcing the principles of the common law applicable to common carriers—particularly that one which requires uniformity of treatment in like conditions of service.

"As, however, the powers of the states were restricted to their own territories, and did not enable them to efficiently control the management of great corporations whose roads extend through the entire country. there was a general demand that Congress, in the exercise of its plenary power over the subject of foreign and interstate commerce, should deal with the evils complained of by a general enactment, and the statute in question was the result."

On the other hand, as has been pointed out by the Supreme Court, in referring to the act to regulate commerce, the purpose of Congress was to embrace the whole range of interstate commerce, and this is made apparent by the exclusion only of domestic commerce in the last clause of the first paragraph of section 1, and in the declaration of the scope and purpose of the act announced in the title. Armour Packing Co. v. United States, and other cases, 209 U. S. 56, 28 Sup. Ct. 428, 52 L. Ed. 681. Now, of course, steamers which undertake for hire to transport the goods of those who may choose to employ them from place to place are carriers (Niagara et al. v. Cordes, 21 How. 7, 16 L. Ed. 41); and undoubtedly whenever as carriers they enter upon the transportation of freight or passengers, and are used under a common arrangement with a railroad for a continuous carriage of passengers or property from one state to another state, they are brought within the purview of the first section of the act.

As there is involved in the opinion just expressed construction of the words "when both are used under a common control, management, or arrangement for a continuous carriage," etc., it is appropriate to consider them for a moment. It is apparent that, by failure in terms to include them, water carriers, doing business as are the steamers belonging to petitioners herein, are not directly in any way subject to the act, unless their connection with railroads and their uses under

certain arrangement with railroads make them so; that is to say, water carriers, situated as are these petitioners, are exempt from the provisions of the act in respect to their intrastate port-to-port business and their interstate port-to-port business. Indeed, there is no real contention otherwise, and it would therefore follow that the Commission has no control over any business done by these petitioners, except such interstate traffic as is carried on under a joint arrangement between them and rail carriers.

[3] But we were told upon the argument that through bills of lading covering part railroad and part water transportation under joint tariffs are issued by the petitioners. Moreover, under the pleadings we must take it as a fact that, for the purpose of establishing certain through routes, petitioners have filed with the Interstate Commerce Commission their joint tariffs, or their concurrence in tariffs filed by the railroad companies, and that the petitioners' steamers carry for hire passengers and freight under said joint tariffs over the water portion of the through routes. These things being true, we find it impossible to escape from the conclusion that there is engagement in transportation in so far as both water and rail are used to carry from one state to another, and there is a common arrangement made as described for a continuous shipment of passengers and freight, whereby petitioners have brought themselves within the terms of the act and are subject to such of its provisions as are applicable to carriers under such arrangement.

Let us see what the practical view of the Commission has been, where the subject of use and arrangement has been adverted to. In the Matter of Joint Water and Rail Lines, 2 Interst. Com. Com'n R. 645, 646–647, the Commission observed:

"* * * * That carriers by water are not in terms brought under the regulation of the act to which carriers by rail are subject, except 'when both are used under a common control, management, or arrangement for a continuous carriage or shipment,' etc. If the carriers by water see fit to operate independently, no authority is conferred upon the Commission to compel them to do otherwise; and the understanding of the Commission is that by the act to regulate commerce the carriers by rail are also left at liberty to act independently. They cannot decline to receive from or deliver freight to connecting water lines; but at the same time they are not required by law to make with the water lines joint rates, though they should be expected to do so when they can thereby subserve the interest of the public without detriment to their own interest. * * * *"

In the third annual report of the Commission the relation of lake and rail transportation received careful consideration. 3 Interst. Com. Com'n R. 289–381. It was commented upon that the act was only applicable to water transportation when used under a common control, management, or arrangement for a continuous carriage or shipment in connection with a railroad and as part of a line or route of which another part is a railroad, and that carriers engaged in transportation wholly by water were independent of regulation. The Commission deplored such a condition. Special reference was made to traffic upon railroads from the Lakes to the Atlantic coast, where the boats were used in connection with a rate under a common control or management, for continuous carriage from Chicago, Duluth, and other Western lake ports to tide water at New York, Philadel-

phia, and other Eastern cities. It was stated by the Commission that such carriers on lake and rail were made subject to the act, and were required to publish their rates and charges, together with proposed increases or reductions.

In the case of Railroad Commission of Florida v. Savannah, Florida & Western Railway Co. et al., 5 Interst. Com. Com'n R. 13, a question involved was whether some of the defendant steamship companies and a certain railroad company were common carriers engaged in interstate commerce and subject of the jurisdiction of the Commission. It was held that while the steamship companies constituted all-water lines, inasmuch as they were each engaged in connection with the railroads in the transportation of oranges from points in Florida to Northeastern cities under through bills of lading, and inasmuch as they joined in the action of the various railroads and steamship lines in advancing certain rates under investigation, under the act and the former decisions of the Commission the companies were carriers of interstate commerce and subject to the jurisdiction of the Commission in respect thereto.

In the Matter of Jurisdiction over Water Carriers, 15 Interst. Com. Com'n R. 205, the Commission again had occasion to give consideration to the question, which was stated in this way:

"* * * Does the fact that a water carrier joins with a rail carrier in forming a through route or establishing a joint rate for the transportation of certain traffic subject all the interstate traffic of such water carrier to the requirements of the act and the jurisdiction of the Commission; or, stated in a narrower form, does such action on the part of a water carrier subject its port-to-port traffic to all the provisions of the act, including the posting and observing of tariffs and similar requirements?"

The language of section 1 of the act, as we have heretofore quoted it, was carefully examined, and it was held that, while interstate commerce wholly by railroad was subject to the act, interstate commerce wholly by water was not; yet it was said:

"It is equally obvious that interstate commerce partly by railroad and partly by water, under a common control, management, or arrangement for a continuous carriage or shipment, is subject to the act."

The Commission then proceeded to determine whether, under conditions where some of the commerce transported by a carrier is subject to the act, all the commerce transported by such carrier was also within the act; and the view taken was that the statute is only applicable to a common carrier or carriers engaged in transportation partly by rail and partly by water, when both are used under a common control, management, or arrangement for a continuous carriage or shipment. Judge Knapp, then chairman of the Interstate Commerce Commission, said:

"The use of the word 'when' is significant, and its natural meaning seems to be that a water carrier is subject to the act 'in so far as' or 'to such extent as' it carries traffic under a common control, management, or arrangement with a railroad."

Regulation of charges exacted upon the port-to-port business of water carriers was held not to be authorized, and reasons were pointed out why any other construction was unreasonable. For example, it

was observed that if one water carrier, by becoming a party to a joint rate with a railroad, was thereby required to publish and adhere to its rates .between ports, it could not hope to compete with a carrier not required to publish and maintain its rates, which would bring about a result whereby the law, instead of promoting and facilitating commerce, would tend rather to its injury, by making unprofitable the instrumentalities provided for the carriage of that commerce. It was shown that under such a construction of the law there might be two water carriers between the same ports attempting to secure the transportation of competitive traffic, one of which would be bound to observe and collect rates which it had published 30 days in advance, while the other could make any rate which would secure the traffic. Nevertheless water carriers were held to be subject to the law as to such interstate traffic as is transported under a common control, management, or arrangement with a rail carrier.

Judicial construction accords with these views. In Ex parte Koehler, Receiver, etc. (C. C.) 30 Fed. 867, decided in April, 1887, though the facts were unlike those before us, the court, in its discussion of the interstate commerce act, thought that it did not apply to all of the agencies or instrumentalities used or engaged in interstate commerce; that it did not include any water craft, unless used in connection with the railways under a common control, management, or arrangement for a continuous carriage or shipment, etc., and said:

"The mere fact that a railway wholly within a state and a vessel running between said state and another meet at a point within the railway state and thus form a continuous line of transportation between the two states by the one taking up the goods delivered by the other at its terminus and carrying them thence to their destination, does not bring the carriers who so use the railway and steamer within the act. So long as the railway and steamer are each operated under a separate and distinct control, making its own rates and only liable for the carriage and safe delivery of the goods at the end of its own route, the act does not apply to the transaction. To make these carriers subject to the act, the railway and vessel must, as therein provided, be operated or used under a 'common control'—a control to which each is alike subject, and by which rates are prescribed and bills of lading given for the carriage of goods over both routes as one."

A fair implication from this language is that, where there is an arrangement and a use by both water and rail carrier under an arrangement by bill of lading given for carriage over both routes, the the carriers are within the act.

In United States v. Wood et al. (D. C.) 145 Fed. 405, the court held that the test of subjection to the act was through routing in interstate commerce, and that when one carrier united with one or more in making a rate for interstate traffic and issued a through bill therefor it became subject to the act, and that the successive receipt and forwarding in the ordinary course of business by two or more carriers in interstate traffic under through bills, or under any arrangement for continuous carriage over their lines, constituted assent to such common arrangement for the carriage within the meaning of the act. See, also, United States v. Camden Iron Works (D. C.) 150 Fed. 214.

In United States v. Colorado & N. W. R. Co., 157 Fed. 321, 85

C. C. A. 27, 15 L. R. A. (N. S.) 167, the Court of Appeals of the Eighth Circuit adverted to the applicability of the act to carriers partly by water and partly by railroad operating under a common control, management, or arrangement, and referred to the amendatory act of June 29, 1906, as governing common carriers engaged in interstate commerce wholly by railroad, even though they are exempt from any common control, management, or arrangement with other carriers.

Going to the highest authority, we find like general construction and definition of what will be looked upon as a common arrangement. In Cincinnati, New Orleans & Texas Pacific Railway Co. v. Interstate Commerce Commission, and Interstate Commerce Commission v. Cincinnati, New Orleans & Texas Pacific Railway Co., 162 U. S. 184, 16 Sup. Ct. 700, 40 L. Ed. 935, it was said:

"* * * But when the Georgia Railroad Company enters into the carriage of foreign freight, by agreeing to receive the goods by virtue of foreign through bills of lading, and to participate in through rates and charges, it thereby becomes part of a continuous line, not made by a consolidation with the foreign companies, but made by an arrangement for the continuous carriage or shipment from one state to another, and thus becomes amenable to the federal act, in respect to such interstate commerce. We do not perceive that the Georgia Railroad Company escaped from the supervision of the Commission by requesting the foreign companies not to name or fix any rates for that part of the transportation which took place in the state of Georgia when the goods were shipped to local points on its road. It still left its arrangement to stand with respect to its terminus at Augusta and to other designated points. Having elected to enter into the carriage of interstate freights and thus subjected itself to the control of the Commission, it would not be competent for the company to limit that control, in respect to foreign traffic, to certain points on its road and exclude other points.

"* * * All we wish to be understood to hold is, that when goods shipped under a through bill of lading, from a point in one state to a point in another, are received in transit by a state common carrier, under a conventional division of the charges, such carrier must be deemed to have subjected its road to an arrangement for a continuous carriage or shipment within the meaning of the act to regulate commerce. When we speak of a through bill of lading, we are referring to the usual method in use by connecting companies, and must not be understood to imply that a common control, management, or arrangement might not be otherwise manifested."

The principle of this last case is to be invoked because the petitioning water carriers before us ship goods under through bills of lading from points in one state to points in another under traffic arrangements with railroads for continuous carriage or shipment. They have thus chosen to make an arrangement, presumably according to the usual method in use by connecting carrying companies, and so have subjected their boats in respect to such interstate carriage to the control vested in the Commission, and are carriers subject to the act.

The learned counsel for the petitioners admitted upon the argument that the two carriers, rail and water, could not disregard the long and short haul provision of section 4 of the act under circumstances where an all-rail carrier could not; but his suggestion was that a reasonable interpretation of the law might be that inasmuch as railroads are subject to the act, and inasmuch as a rail carrier can

do nothing by itself or with another railroad or with a water carrier which cannot be reached by act of Congress, the remedy for a violation of the law in respect to traffic carried by water carrier under common arrangement, except as to rebates, may be found by dealing with the rail carrier only, and which alone may be liable. This argument must needs find support in some construction of the text whereby water carriers are exempted, even though operating in interstate traffic under an arrangement with a railroad for a continuous shipment. It therefore involves limiting the term "common carrier" embraced in section 1 to railroads entering into arrangements with water carriers, and so confines authority conferred by section 20 to inquiry into the carriage concerns of the railroad only. The words of the statute, however, do not so restrict the common arrangements for use. They include any common carrier or carriers engaged in transportation of passengers or property partly by railroad and partly by water, and thus have that broader scope which the Commission has time and again regarded them as having, and which upon careful examination we believe to be in accord with the spirit as well as the letter of the law.

Regarding the petitioners, therefore, as subject to control, we nevertheless must not overlook limitations which are incidental to the subjection as well as to the regulating power.

As we have already seen, the subjection is at once restricted, for the reason that the intrastate port-to-port business and the interstate port-to-port business of the petitioners are outside the purview of the act of Congress; so we can advance to a consideration of whether or not the regulating power is limited by section 20.

The contention of the government here is that the Commission is authorized to call for full reports of the entire business of these petitioners, intrastate as well as interstate, while petitioners say that no such authority is given or could be given.

The broad object of section 20 evidently was to clothe the Commission with authority to call for any and all information which would enable the Commission to act intelligently in the lawful exercise of its delegated power of rate regulation. Of course, without some precise knowledge of traffic conditions and of interstate business, the reasonableness of rates and fares relating to such business would be impossible of determination. But Congress has expressly restricted the authority to call for reports and to prescribe the form of such reports to common carriers subject to the provisions of the act. It is impossible to read section 20 as independent of section 1 imposing this limitation. And inasmuch as the act has only to do with interstate commerce and carriers engaged in interstate commerce, only such carriers can be included within those which must respond to the calls for information and comply with the requirements of the Commission in matters of accounting. This being true, inasmuch as the reports of affairs, accounts, finances, and like things of the carriers are evidence for the ascertainment of facts relating to the interstate business, which alone is the proper subject of regulation, the scope of the right to call for the report is confined by the nature of the

business to be set forth within the report when made. As a correlative proposition, the obligation upon the carrier, subject to the provisions of the act, is to report such business as is interstate and not exempt, and under section 20 there is no obligation upon it to report other business.

Furthermore, the act only confers the right to prescribe how accounts of business properly the subject of regulation shall be kept, and no duty rests upon the carrier to obey orders prescribing methods or forms of accounting except for such business. It is said by the government, however, that, conceding lack of power to regulate any commerce, except that which is carried on under common arrangement, nevertheless the interstate and intrastate operations of these water carriers, petitioners, are so commingled that it is impractical to obtain information of the interstate traffic without full knowledge of the intrastate concerns. The answer to these suggestions is in the text of the law, which expresses the mind of Congress and limits all authority to the regulation of carriers subject to the provisions of the act, and which in this case are those engaged in transportation of a particular nature; that is to say, interstate, partly by rail and partly by water, used under a common arrangement as already defined.

We recognize that section 20 relates to reports by carriers rather than to the carriage itself, but the power to call for the information in the report is circumscribed by the relation of the report to the thing itself, interstate traffic. A like rule must govern with respect to bookkeeping and accounting methods. The Commission, in the exercise of the power to establish a uniform system of accounting, can only lay down forms and rules which relate to the subject itself, interstate traffic not exempt.

It may be that difficulties will arise which will make it hard for the Commission to confine its inquires into interstate business done under arrangement with the rail carrier and to prescribe systems of keeping books and accounts without impinging upon matters which are intrastate exclusively, and it may be a somewhat tedious work for the carrier to furnish this information and to follow the system of accounting; but, as Congress has seen fit to exercise its authority with respect to that which is interstate, mere perplexities of framing the interrogatories or of accounting, or recording the evidences of such transactions, cannot be urged as a reason for refusing to sustain the power conferred. Nor does it seem logical to say that if the business is so far separable as to furnish a basis for a common arrangement as to part of it that report and systematic account of such part cannot be had without report of the whole.

It is fitting at this point to repeat that the reports and the methods and forms contemplated under section 20 are for the information of the Commission and for the simplification of furnishing such information. But we must not confuse such reports with information sought under an investigation undertaken by the Commission upon complaint or of its own motion. In the one instance the Commission calls for facts necessary to the general performance of a duty impos-

ed upon it; in the other it exerts its power to obtain evidence necessary to enable it to decide a question involving something like an issue. The information by report being directly pertinent to the substantive subject of what is interstate commerce, and this being the proper subject of regulation, presumably will be furnished by the carrier in truthful and honest statement.

If, however, the report of the carrier is not accurate or truthful, or the information furnished is not sufficiently complete to enable the Commission to perform its duty, there are ways by which investigation can be had and which, if pursued, clearly may render it proper for the Commission, in its effort to get at the truth of the interstate business of the carrier, to inquire fully into its intrastate business—not with a view of exerting power over such intrastate business, but because inquiry into such business is essential in order to know the true condition of the interstate business. Such a contingency, however, is not presented upon first motion under section 20, nor does the right to obtain such necessary information carry with it the right of investigation into business not interstate and not directly connected therewith. For instance, it would seem to be relevant in the Goodrich cases to inquire into the amount of capital stock, debts, value of franchises, improvements, receipts, dividends, and such other matters pertinent to the business of the corporation as Congress evidently regarded to be foundation knowledge for the Commission to have; but, so far as appears in the record in cases 23 and 24, there is no necessity for going into the details of the amusement park business carried on by the White Star Lines, for it has no relation to interstate traffic.

It is a circumstance of slight force, but deserving of mention as in line with these observations, that nowhere in section 20 is there reference to "investigation" by the Commission. "Reports" containing "information" may be required, and forms of accounts, records, and memoranda may be prescribed—even inspection and examination of accounts, records, and memoranda may be had by examiners of the Commission—but they are always for purposes of information.

Information of interstate traffic business and power to make the carrier report it by a uniform system of accounting are the keynotes of section 20. "Investigation," on the other hand, is the word employed in parts of section 12, authorizing depositions in proceedings before the Commission; investigation is authorized where complaint is made or where questions arise as provided for by sections 13 and 15 of the act. Reports of "investigations" are to be made (section 14), and attorneys may be employed for proper representation of the public interests in "investigations" made by the Commission, or proceedings pending before it or in court.

These considerations make it reasonable to construe the power given by section 20 as one pertaining to first information, ample presumably to secure necessary facts to enable the Commission to go forward, yet not broad enough in initial proceeding to warrant inquisitorial investigation into collateral affairs, which of themselves do not constitute interstate commercial traffic or are not necessarily directly interwoven therewith.

Under this view of the power conferred upon the Commission by section 20, it is very clear that the authority to require the reports of interstate business where there is the use under a control as prescribed is granted. In Baltimore & Ohio Railroad Co. v. Interstate Commerce Commission, 221 U. S. 612, 31 Sup. Ct. 621, 55 L. Ed. ——, the Railroad Company brought a bill to annul an order of the Commission requiring the Railroad Company to make monthly reports showing the instances where employés subject to Act Cong. March 4, 1907, c. 2939, 34 Stat. 1415 (U. S. Comp. St. Supp. 1909, p. 1170), had been on duty for a longer period than that allowed. The contention of the carrier was that the Commission had no authority to require the reports called for. The Supreme Court examined section 20 of the act to regulate commerce, and held that a grant of power extended to the Commission in the execution of the act whereby they could order carriers to file monthly reports of earnings and expenses and to file periodical or special, or both periodical and special, reports concerning any matter about which the Commission is authorized or required by law to inquire or keep itself informed, or which it is required to enforce, etc., clearly embraces the power which the Commission had there asserted, and authorized it "to promulgate an order requiring reports to be made." But it appears that the court limited its observations to interstate business and was careful not to construe the law as extending the power beyond the right to make the order requiring reports of such business.

From these expressions it follows that the theory of the Commission in the present cases was erroneous. It acted within its authority when it made an order calling for reports of all business done by the petitioners under through bills of lading where the transportation was partly by railroad from one state to another, or from one place in the United States to Canada, an adjacent foreign country; and it was within its power when it prescribed the system of accounts and the uniform method of keeping accounts for such interstate business, and so far as the orders call for information confined to such traffic, or directly related thereto, and so far as the orders prescribe uniform systems of bookkeeping and accounting for such traffic and such as is directly related thereto, they must be sustained. But, in so far as the reports called for and the accounting rules prescribed extend beyond such interstate business of the carriers, or include matters of intrastate traffic accounts and affairs and concerns exclusively, they become invasions of the rights of the carriers, and to the extent of such invasions are unlawful.

What we have said makes the conclusion of the case comparatively simple. Petitioners are amenable to the law with respect to all interstate business done by them in connection with railroads under arrangements such as have been discussed, and the Commission acted within its authority when it made orders for reports with respect to such business and prescribed forms of accounting for such business; but it went beyond its authority in calling for reports of transactions relating exclusively to port-to-port interstate business, or to intrastate traffic or affairs, and in propounding questions and prescribing

bookkeeping and accounting methods in respect thereto. A recast of the forms of reports should be made by the Commission, acting in conformity with the views herein expressed. We think it advisable that the Commission, rather than the court, should proceed to make the recast.

The demurrers are overruled, and the motions to dismiss are denied, and the prayers of the petitioners for orders of injunction are granted. The orders issued by the Commission are hereby set aside, and the matter is referred to the Commission, to be proceeded with as may be proper under the law as herein indicated. So ordered.